UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AM GENERAL LLC, | Case No. 17-cv-08644-GBD |
| Plaintiff, | **ORAL ARGUMENT REQUESTED** |
| - against - | |
| ACTIVISION BLIZZARD, INC., ACTIVISION PUBLISHING, INC., and MAJOR LEAGUE GAMING CORP., | |
| Defendants. | |

**PLAINTIFF AM GENERAL LLC'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

FACTUAL BACKGROUND......................................................................................................4

    A.    AM General's HUMVEE® Intellectual Property....................................................4

    B.    Activision's Use of The HUMVEE® Intellectual Property ...................................5

I.     SUMMARY JUDGMENT STANDARD ........................................................................12

II.    ACTIVISION MAY NOT ASSERT A LACHES DEFENSE .........................................12

    A.    Activision's Infringement Was Willful .................................................................13

    B.    Activision Cannot Point to the First Amendment to Justify Its Conduct ..............22

CONCLUSION.........................................................................................................................25

## TABLE OF AUTHORITIES

**Page**

### Cases

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)................................................................................................ 12

Arista Records LLC v. Lime Grp. LLC,
2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011)........................................................ 23

Chanel, Inc. v. Veronique Idea Corp.,
795 F. Supp. 2d 262 (S.D.N.Y. 2011).............................................. 13, 16, 17, 18

Donahue v. Artisan Entm't, Inc.,
2002 WL 523407 (S.D.N.Y. Apr. 8, 2002)........................................................... 17

E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.,
90 F. Supp. 2d 277 (S.D.N.Y. 2000)..................................................................... 23

F.D.I.C. v. Giammettei,
34 F.3d 51 (2d Cir. 1994)...................................................................................... 12

Fendi Adele S.R.L. v. Burlington Coat Factory Corp.,
689 F. Supp. 2d 585 (S.D.N.Y. 2010)............................................................. 14, 22

Hermes Int'l v. Lederer,
219 F.3d 104 (2d Cir. 2000).................................................................................. 12

Hicks v. Baines,
593 F.3d 159 (2d Cir. 2010).................................................................................. 12

Lang v. Ret. Living Pub. Co.,
949 F.2d 576 (2d Cir. 1991)............................................................................. 13, 15

Malletier v. Dooney & Bourke, Inc.,
2007 WL 1498323 (S.D.N.Y. May 22, 2007) ...................................................... 13

Matthews v. City of New York,
779 F.3d 167 (2d Cir. 2015).................................................................................. 12

Rogers v. Grimaldi,
875 F.2d 994 (2d. Cir. 1999)................................................................................. 17

Spring Mills, Inc. v. Ultracashmere House, Ltd.,
689 F.2d 1127 (2d Cir. 1982)................................................................................ 21

Tiffany & Co. v. Costco Wholesale Corp.,
127 F. Supp. 3d 241 (S.D.N.Y. 2015)......................................................... 13, 14, 15

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
 2000 WL 1262568 (S.D.N.Y. Sept. 6, 2000)...................................................... 23, 24

*Venetianaire Corp. of Am. v. A & P Imp. Co.*,
 302 F. Supp. 156 (S.D.N.Y. 1969) ........................................................................ 21

*Victorinox AG v. B & F Sys., Inc.*,
 114 F. Supp. 3d 132 (S.D.N.Y. 2015)............................................................. passim

*Victorinox AG v. B&F Sys., Inc.*,
 709 F. App'x 44 (2d Cir. 2017) ................................................................ 12, 13, 24

*Yankee Pub. Inc. v. News America Pub. Inc.*,
 809 F. Supp. 267 (S.D.N.Y. 1992) ........................................................................ 17

### Rules / Statutes

Fed. R. Civ. P. 56(a) ................................................................................................. 12

### Other Authorities

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (5th ed.
 2019). .................................................................................................................... 13

## PRELIMINARY STATEMENT

Defendants Activision Blizzard, Inc., Activision Publishing, Inc., and Major League Gaming Corp. (collectively, "Activision" or "Defendants") have made billions of dollars by using AM General's iconic HUMVEE® military vehicle and its distinctive trade dress (the "HUMVEE® Trade Dress") in eight *Call of Duty* video games, numerous ads, two toys, and several strategy guides. Activision neither sought nor obtained permission from AM General to do so. Activision's conduct constitutes, among other things, trademark and trade dress infringement under the Lanham Act.

Activision has sought to avoid liability by claiming that its conduct is shielded by the First Amendment and by asserting an affirmative defense of laches. By this motion, Plaintiff AM General asks the Court to dispose of the laches defense. A defendant who engages in willful infringement may not invoke laches. As explained below, the evidence is undisputed that Activision acted willfully. The evidence comes from Activision's own documents, its executives' deposition testimony, and its own conduct. The evidence proves that Activision used the HUMVEE® Trade Dress knowing that it had no right to do so, knowing that it was unlawful to do so, yet intending to reap a substantial benefit from its widespread, unauthorized use.

The HUMVEE® vehicle did not end up in just one *Call of Duty* game, or in just a minor way, or by chance. Activision's witnesses admitted that, from the moment they decided to make a *Call of Duty* game set in the modern era, ████████████████████████████ ████████████████████████████████████ Activision's designers ████████████████ ████████████████████ the HUMVEE® Trade Dress in every detail. Activision's witnesses admitted that they used the HUMVEE® vehicle ████████████████████████████ ████████ The company intended game players to believe that the vehicle that appeared in its games is the HUMVEE® vehicle.

To that end, the HUMVEE® vehicle shows up in eight *Call of Duty* games, in numerous levels, and hundreds of times. Characters call out to one another to "get in the Humvee." Although many military aircraft and vehicles appear in those of the *Call of Duty* games that are set in current and near-future times, the HUMVEE® vehicle is the only military vehicle that appears in every one of them. In fact, so valuable is the HUMVEE® vehicle to the *Call of Duty* franchise that Activision's president admitted that, ████████████████████████ ████████████████████████████████████ ████████████████

Activision's willfulness did not stop with the game itself. Activision knowingly used the HUMVEE® vehicle in its *Call of Duty* advertising and promotional materials. To create those ads, Activision ████████████████████████████████ ████████████████████████████████ It is thus no surprise that Activision depicted the HUMVEE® vehicle in those materials. Activision's witnesses have admitted that ████████████████████████████████ ████ And research AM General conducted during this case confirms that Activision got the benefit it wanted: Viewers who watched trailers with HUMVEE® vehicles were substantially more likely to be interested in, buy, and recommend the game than viewers who saw trailers without HUMVEE® vehicles in them.

Activision also brought ████████████████ real HUMVEE® vehicles to live promotional events. Activision even designed *Call of Duty* contests that would include giving away a civilian version of the HUMVEE® vehicle to the winner.

Activision did all of this even though it knew it did not have the right to depict the HUMVEE® Intellectual Property. And Activision knew that it was unlawful to copy trademarked objects. In fact, in the years before Activision launched *Call of Duty*, AM General

had objected to Activision's use of the HUMVEE® Trade Dress in another game, and Activision agreed to remove it, causing AM General to believe that Activision would not infringe AM General's rights in the HUMVEE® Trade Dress in the future. Despite Activision's admitted knowledge that it did not have the rights to do what it was doing, Activision used the HUMVEE® Intellectual Property without AM General's permission anyway, consistent with its pattern of seeking a license only when challenged by trademark owners.

These undisputed facts are more than sufficient to find, as a matter of law, that Activision's infringement was intentional. They show that Activision: (1) slavishly copied the HUMVEE® Trade Dress to allow Activision to benefit from its goodwill; (2) used the HUMVEE® Intellectual Property in its products and advertising, knowing that it did not have the right to do so; and (3) infringed AM General's rights after assuring AM General that it would stop.

But there is more. During discovery into Activision's unauthorized use of the HUMVEE® Trade Dress, each Activision witness testified that  When AM General attempted to inquire ████████████, Activision ███████████████████████████ ███████████ affirmed that it was not asserting an "advice of counsel" defense. Activision had that right. But the law is equally settled that Activision cannot now reverse course and ask the Court to excuse its conduct on the grounds that it was not a willful infringer and was, instead, acting under a belief—in good faith or otherwise—that its conduct was lawful.

Because there can be no genuine dispute that Activision acted intentionally in infringing AM General's HUMVEE® Intellectual Property, the Court should bar Activision from asserting laches as a defense.

**FACTUAL BACKGROUND**

A.     **AM General's HUMVEE® Intellectual Property**

AM General is an Indiana-based company that designs, engineers, and manufactures the HUMVEE® line of military vehicles, which it sells using the registered trademarks HUMVEE® and HMMWV® (an acronym for "High Mobility Multipurpose Wheeled Vehicle") (together with the HUMVEE® Trade Dress, the "HUMVEE® Intellectual Property"). *See* AM General's Statement of Undisputed Material Facts ("SUF") ¶¶ 1-3, 9, 11.

Since its introduction in the 1980s, the HUMVEE® vehicle has achieved "iconic" status. *See id.* ¶¶ 2, 6-8, 12-13. For more than three decades, the HUMVEE® vehicle has been the light tactical vehicle of choice of the U.S. military as well as dozens of friendly foreign militaries abroad. *Id.* ¶¶ 2-3. As other courts have recognized, in 1991, during Operation Desert Storm, the vehicle "gained national attention" as "thousands of Humvee vehicles were deployed during the Persian Gulf War." *Id.* ¶ 6. "The Humvee gained considerable renown—'fame' in the everyday sense—in news reports, entertainment, toys, and advertising." *Id.* ¶ 7.

The exterior appearance of the vehicle is "instantly recognizable" as the HUMVEE® vehicle. *See id.* ¶¶ 8, 12, 38 (quoting Activision's admission that the HUMVEE® vehicle is an "easy to identify and recognizable landmark" in the games). Elements of the vehicle's exterior design that constitute the HUMVEE® Trade Dress include the vehicle's boxy overall shape, a slanted upper rear portion of the vehicle, rectangular doors, an X design on the lower portion of the doors (in certain configurations), side mirror mounts attached to each side of the vehicle adjacent to the vehicle windshield (not to the vehicle's doors), a windshield that is bisected by a metal bar and does not have lights above it, windshield wipers attached to the top of the front windows, a blackout headlight in the left front hood recess, seven vertical ovals comprising the front grille, its color, and/or, in certain configurations, a deep water fording exhaust pipe. *Id.* ¶

4

10. Figures 1 and 2 show examples of the HUMVEE® vehicle and the HUMVEE® Trade Dress:

 

**Figure 1** (Ex. 134)          **Figure 2**  (Ex. 79)

**B.    Activision's Use of The HUMVEE® Intellectual Property**

Activision is a developer, publisher, and distributer of video games.  *See* SUF ¶ 5.  In 2003, Activision launched a series of video games under the brand *Call of Duty*.  *Id.*  The early games focused on World War II combat settings.  *Id.* In 2007, Activision released *Call of Duty 4: Modern Warfare*, a game which signaled the series' shift into modern combat settings.  *Id.*  As early as 2004, Activision's plans for the *Modern Warfare* series included ██████████████ ████████████████████████████ Activision intended to ██████ ██████████████████████████████████████████████████████ ██████████████████████████████████

Starting in 2007, with *Call of Duty 4: Modern Warfare*, Activision released eight games that include HUMVEE® vehicles as part of the game: *Call of Duty: Modern Warfare 2* (2009); *Call of Duty: Modern Warfare Mobilized* (2009); *Call of Duty: Modern Warfare 3* (2011); *Call of Duty: Black Ops II* (2012); *Call of Duty: Ghosts* (2013); *Call of Duty: Heroes* (2014); *Call of Duty: Modern Warfare Remastered* (2016) (together "the *Call of Duty* Games").  *Id.* ¶ 14.

HUMVEE® vehicles are an important part of gameplay of the *Call of Duty* Games, appearing no fewer than 209 times across the eight games and are referred to by the HUMVEE®

and HMMWV® names. *Id.* ¶¶ 15-22, 39, 42-55. Activision also used HUMVEE® vehicles in marketing and promotional merchandise around the *Call of Duty* Games. *Id.* ¶¶ 56-66, 74-96. HUMVEE® vehicles appear in at least 24 trailers for the games, two toy construction sets, and four strategy guides. *Id.* ¶¶ 56, 76, 94. Real HUMVEE® vehicles have appeared at live promotional events for the *Call of Duty* Games. *Id.* ¶¶ 67-69.

*Call of Duty 4* was not the first time Activision had used a HUMVEE® vehicle in a game, however. *See id.* ¶¶ 24-26. In 1998, Activision had attempted to use HUMVEE® vehicles in a video game titled *Sin*. *Id.* But when AM General's licensing agent complained, Activision acknowledged that the HUMVEE® Trade Dress was a valuable AM General asset and took the HUMVEE® vehicles out of the game. *See id.* ¶¶ 25-26. Thus, Activision knew before developing *Call of Duty* that it shouldn't use AM General's HUMVEE® Intellectual Property without AM General's permission. *See id.* ¶¶ 24-26. Despite its assurances to AM General, it plunged ahead with its uses in the *Call of Duty* games.

The HUMVEE® vehicle did not end up in eight *Call of Duty* Games, numerous advertisements and live events, two toys, and several strategy guides by accident. It was a conscious effort from the start. References to using HUMVEE® vehicles in the series ███ ████████████████████████████████████████████████████████████████████ During the design process, Activision ████████████████████████████████████████████ ████████████████████████████ Activision's designers ███████████████████████ ███████████████████████████████████████████████████████████ The vehicle that Activision ultimately designed bore all of the trade dress elements of the HUMVEE® Trade Dress. ███████████ Activision's designer admitted that he ████████████████████████████████ ████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

All told, it took Activision's designer ████████████████████████████████████

████████████████████████████████████████████

    Activision's designers admitted that they ██████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████ Activision's Vice President of Public

Relations knew that, ████████████████████████████████████████████████

█████████████████████████████████ Notably, although Activision created

generic versions of scores of other vehicles and real world objects for the *Call of Duty* Games,

*id.* ¶ 39, it created the HUMVEE® vehicle with as much detail and realism as possible, *id.* ¶ 35-

36, 38, 47.  This level of realism—in which not only modern combat settings are depicted

realistically but in which branded objects that exist outside of the game are made a part of the

gameplay—was an important component of the success and competitive position of the *Call of*

*Duty* Games in the marketplace.  *See id.* ¶¶ 42-48.  Figures 3 and 4 are images of the

HUMVEE® vehicle as depicted in Activision's *Call of Duty* Games:



Figure 3 (Ex. 21)                  Figure 4 (Ex. 21)

    Similarly, Activision used HUMVEE® vehicles in advertising ██████████████████

█████████████████████████ Activision intentionally selected scenes from the *Call of*

*Duty* Games that included HUMVEE® vehicles for use in promotional trailers.  *Id.* ¶¶ 56-60, 63-

65. Activision also ███████████████████████████████████████████████

███████████████ Activision continuously ██████████████████████████

████████████████████████████████████████████████████████████████████

Activision's goal █████████████████████████████████████████████████

██████ a study confirms that viewers who watched trailers with HUMVEE® vehicles were

substantially more likely to be interested in, buy, and recommend the game than viewers who

saw trailers without HUMVEE® vehicles in them. *Id.* ¶ 62.

To further associate its *Call of Duty* Games with AM General's HUMVEE® vehicles,

Activision arranged for real HUMVEE® vehicles to appear at promotional events, which, as

Activision's Vice President for Public Relations, put it, ████████████████████████

████████████████████ Activision then used live events in its social media marketing, such as its

official Twitter page, posting the below photo of a HUMVEE® vehicle branded with a *Call of*

*Duty: Modern Warfare 3* logo, at a launch event:



*Id.* ¶ 67 (citing Ex. 129).

███████████████████████████████████ promotional contests in which the winner would receive a civilian version of the HUMVEE® vehicle. *See id.* ¶¶ 71-73. As Activision's Chief Marketing Officer stated, ████████████████████████████████████████████ ████████████████████████████████████ The Director of Global Brand Management explained that ██████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████

At no point did Activision make any attempt to dispel any confusion as to the association between the makers of the HUMVEE® vehicle and Activision and/or *Call of Duty*. In fact, Activision made repeated use of the HUMVEE® and HMMWV® trademarks within the *Call of Duty* Games to refer to the vehicle by name. *Id.* ¶¶ 20-22. Moreover, the instruction booklet for many of the *Call of Duty* Games included a statement in the games' Software License Agreement that "all titles, ownership rights and intellectual property rights in and to this Program … including but not limited to any …. Objects, characters … [or] artwork … are owned by Activision or its licensors," unequivocally implying that the HUMVEE® Trade Dress was either (a) owned by Activision or (b) licensed by Activision—neither of which is true. *Id.* ¶ 41.

Despite the important part the HUMVEE® Trade Dress played in the success of the *Call of Duty* Games, Activision decided early on that ████████████████████████████████ ██████████████████████████████████ It knew from the beginning that it did not have AM General's permission, license, or authorization to use the HUMVEE® Intellectual Property, *id.* ¶¶ 24-28, 101-03. And Activision employees admitted time and again, contemporaneously with development and distribution of the *Call of Duty* Games, that Activision ████████████████

█████████████████████████████████████████████

█████████████████████████████████ *Id.* ¶¶ 74-90 █████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████ *see also id.* ¶¶ 91-93 ██████████████

████████████████████████████████.

By contrast, Activision ███████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████ *Id.* ¶¶ 97-100,
104-06.  As reflected in its SEC Filings, Activision fully understood and identified as a "risk"
that "many of [its] products are highly realistic and feature materials that are based on real-world
examples, which may be the subject of intellectual property clams of others."  *Id.* ¶ 114.  Yet
Activision's conduct in connection with the *Call of Duty* Games was willful, for it ████████████

████████████████████████  When asked why Activision had ████████████████████

███████████████████████████  one Activision executive exclaimed, █████████████

██████████████████████  *Id.* ¶ 106.  Apparently,
that standard does not apply to Activision's attitude about using AM General's intellectual
property without a license.

Perhaps Activision was unwilling to pay AM General a reasonable royalty.  *See id.* ¶ 100
███████████████████████████████████████████████  Activision has known
that the HUMVEE® vehicle plays an important part in the success of the *Call of Duty* Games, so
financial considerations may have driven its serial theft of AM General's HUMVEE® Trade
Dress.  *See id.* ¶¶ 14-23, 38-40, 42-62, 66-73, 76-77, 94-96.  To give just one example, in

connection with *Call of Duty: Modern Warfare 3*, when Activision was ███████



████████████████████████████████████████████████ *Id.* ¶¶ 49-55.

Activision ████████████████████████████████████████

████████████████████████████ *Id.* Activision admitted that

it ████████████████████████████████████████

███████ *Id.* ¶ 50. ████████████████████████

███████████████ When pressed at his deposition to state

████████████████████████████████████████

███████████████████ Activision's president ███████████

███████████████ *Id.* ¶ 55.

After AM General discovered Activision's use of the HUMVEE® Intellectual Property in May 2016, it wrote Activision complaining of its use. *Id.* ¶ 118. Activision ignored them. *Id.* ¶¶ 119-122. Instead of ceasing its unlawful conduct, in November 2016 Activision marched ahead with the release of its eighth infringing title, *Call of Duty 4: Modern Warfare Remastered*. *Id.* ¶¶ 119-120. Activision continues to sell all of the infringing *Call of Duty* Games to this day. *Id.* ¶ 122.

Though Activision asserts that every use of the HUMVEE® Intellectual Property was submitted to its legal department for review, *id.* ¶¶ 107-110, 112-115, Activision is not invoking the "advice of counsel" defense, *id.* ¶¶ 116, and Activision has blocked discovery into its legal assessments of Activision's use of the HUMVEE® Intellectual Property, *id.* ¶¶ 116-117.

## LEGAL DISCUSSION

### I.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the pleadings and supporting documents "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Although the Court must view the evidence "in the light most favorable to the nonmovant," *Matthews v. City of New York*, 779 F.3d 167, 171 (2d Cir. 2015), a party cannot raise a genuine issue of material fact by relying on "mere conclusory allegations or denials," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).  The party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.  "Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff  'may satisfy its Rule 56 burden by showing that there is an absence of evidence to support [an essential element of] the [non-moving party's] case.'" *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citation omitted).

### II.  ACTIVISION MAY NOT ASSERT A LACHES DEFENSE

The laches defense does not protect a defendant who has acted willfully or in bad faith. Rather, "intentional infringement is a dispositive, threshold inquiry that bars further consideration of the laches defense[.]" *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000) (holding laches defense inapplicable to claim for injunctive relief in light of intentional infringement); *Victorinox AG v. B&F Sys., Inc.*, 709 F. App'x 44, 50 n.5 (2d Cir. 2017), *as amended* (Oct. 4, 2017) [hereinafter *Victorinox II*] (laches defense inapplicable to

claim for monetary relief because of willful infringement).  In other words, the laches defense is "unavailable [where] Defendants lack clean hands."  *Id.*

In assessing intentional infringement, courts interchangeably use the terms "intentional" and "willful," and consider willfulness in the context of the "bad faith" prong of the *Polaroid* factors, as well, considering whether the defendant acted with good or bad faith.  *See Victorinox II*, 709 F. App'x at 50 & n.5 (in evaluating bad faith prong of *Polaroid* factors, finding that Defendants "willfully infringed," and dismissing laches defense on that basis); *see also Malletier v. Dooney & Bourke, Inc.*, 2007 WL 1498323, at *1 (S.D.N.Y. May 22, 2007) ("[T]o the extent that the Second Circuit has used both 'bad faith' and 'willful deception' in describing the requisite proof for an award of profits, the terms have been used interchangeably."); *see also id.* n.4 (collecting cases).  Regardless of the term used, laches does not protect a defendant who acted willfully, intentionally, or in bad faith.

## A.      Activision's Infringement Was Willful

A defendant's infringement is willful when it "adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."  *Tiffany & Co. v. Costco Wholesale Corp.*, 127 F. Supp. 3d 241, 251 (S.D.N.Y. 2015) (quoting *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991)).  "Since direct evidence of intent is almost never available, circumstantial evidence is usually the evidentiary basis for proving fraudulent intent of the defendant."  4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:113 (5th ed. 2019).

 Accordingly, courts have found intentional infringement, at the summary judgment stage, under a variety of circumstances, including where: (1) the defendant knowingly copied the plaintiff's mark, *see Tiffany*, 127 F. Supp. 3d at 251; (2) the defendant knew that it lacked the rights to use the plaintiff's mark, *Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp. 2d 262,

269-70 (S.D.N.Y. 2011); (3) the defendant continued to use the plaintiff's mark after being notified that the plaintiff objects, *Fendi Adele S.R.L. v. Burlington Coat Factory Corp.*, 689 F. Supp. 2d 585, 599-600 (S.D.N.Y. 2010), *amended on reconsideration* (Mar. 23, 2010); and (4) where the defendant's "slavish copying" is unexplained by anything other than a motive to associate with the plaintiff's brand, *Victorinox AG v. B & F Sys., Inc.*, 114 F. Supp. 3d 132, 141 (S.D.N.Y. 2015) [hereinafter *Victorinox I*], *aff'd sub nom. Victorinox AG v. B&F Sys., Inc.*, 709 F. App'x 44 (2d Cir. 2017), *as amended* (Oct. 4, 2017).

It is undisputed that Activision engaged in each form of the foregoing conduct that courts have held to independently constitute intentional infringement at the summary judgment stage:

*First*, Activision knowingly copied the HUMVEE® Trade Dress. It is undisputed that Activision intended to and did create a slavish copy of the HUMVEE® Trade Dress. *See supra* at 6-7; *see also* ECF 129 at 5 (Activision admits that "Humvee vehicles being depicted in certain games ... isn't even in dispute"). Activision's designers ██████████████████████████ *supra* at 6 (citing SUF ¶ 34), ██████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████ ████████ (citing SUF ¶¶ 30-33). Activision's vehicle designer admitted that ████████ ██████████████████████████████████████ ████████████████████████████████ *Supra* at 6 (citing SUF ¶¶ 36-38, 47). ████████████████████████████ ████████ the vehicle that appears in the *Call of Duty* Games, trailers, and strategy guides bears all of the HUMVEE®'s Trade Dress elements. *Supra* at 6 (citing SUF ¶ 35, 38).

In *Tiffany & Co. v. Costco Wholesale Corp.*, 127 F. Supp. 3d 241, 249-51 (S.D.N.Y. 2015), the plaintiff sued the defendant under the Lanham Act for creating diamond rings that

were "nearly identical in 'content'" to those of the plaintiff and using the term "Tiffany" to describe them. The court granted summary judgment for the plaintiff. In connection with the sixth *Polaroid* factor, which concerns "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product," *see Lang*, 949 F.2d at 583—essentially the same inquiry a court makes in determining whether the defendant engaged in willful infringement or bad faith—the court concluded that the defendant had intended to deceive consumers. There were "side-by-side images" that highlighted the similarity of the products, and the court based its conclusion on "evidence that defendant asked its vendors to copy Tiffany's products," *see* 127 F. Supp. 3d at 249, 251-52, and emails in which defendant's employee referenced her desire for the "Tiffany . . . look," *id.* at 249, 251. The defendant contended that it had acted in good faith because it believed "Tiffany's" was a generic term and therefore "ha[d] not adopted the Tiffany mark at all, but simply utilized the generic term 'Tiffany[.]'" *Id.* at 251-52. The court rejected this argument and concluded that "no rational finder of fact could conclude that [defendant] acted in good faith . . . ." *Id.* at 252. The defendant made "explicit efforts to copy Tiffany's designs by making references to Tiffany designs and sharing links to Tiffany's website." *Id.* at 251. This fact—that the defendant sought to replicate Tiffany's designs—rendered defendants' asserted lack of bad faith "untenable." *Id.* at 252.

Activision engaged in the same conduct at issue in *Tiffany*: It told its employees to copy the HUMVEE® Trade Dress—exactly. It sold video games containing its copied HUMVEE® Trade Dress. It licensed third parties the right to create their own replicas of the HUMVEE® vehicle. These undisputed facts demonstrate Activision's bad faith. *See id.*

**Second**, Activision knew that it lacked the right to use HUMVEE® Trade Dress, but continued to use it anyway. In 1998, several years before Activision began its development of

the *Call of Duty* Games, AM General complained to Activision about its use of the HUMVEE®

Trade Dress in a video game titled *Sin*. *See supra* at 6 (citing SUF ¶¶ 24-26). Activision

acknowledged AM General's rights by agreeing to take HUMVEE® vehicles out of the game.

*See id.* Thus, before Activision launched the *Call of Duty* Games, it had actual notice of AM

General's claim of ownership of the rights to use HUMVEE® vehicles in video games. And

Activision knew from that experience that AM General did not want its HUMVEE® Trade Dress

used in Activision's video games. Although those undisputed facts alone suffice to establish this

form of willful infringement, Activision's employees admittedly knew ████████████████████

██████████████ Contemporaneously with the creation of the *Call of Duty* Games,

Activision's key marketing and licensing personnel acknowledged that ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ *See supra* at 9-10 (citing SUF ¶¶ 24-28, 63-65, 74-93, 101-03).

This is a stronger showing than what the court found sufficient in *Chanel, Inc. v.*

*Veronique Idea Corp.*, 795 F. Supp. 2d 262, 269 (S.D.N.Y. 2011). There, the court found at the

summary judgment stage that the defendants' infringement was willful because there was

evidence that they knew they did not have the rights to use the plaintiff's "Chanel" mark, but

continued doing so anyway. In particular, an employee of defendant admitted in deposition "that

he had concerns about purchasing inauthentic Chanel-branded merchandise" and "[n]onetheless,

he continued to purchase and sell the products bearing the Chanel Mark." *Id.* The court held

that this evidence demonstrated that the defendants had acted "with full knowledge that they did

not have the authority to use the [plaintiff's] mark for any purpose," and that their infringement

was therefore willful. *Id.* The court further rejected the defendants' attempt to justify their

conduct by claiming that "they saw other companies in New York selling the same" products

such that "they believed they were acting in good faith," finding that such claim had no support in any legal authority whatsoever.  *See id.* at 270.

Here, Activision's key licensing and marketing personnel for the *Call of Duty* Games admitted time and again that ███████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████  *See supra* at 9-10 (citing SUF ¶¶ 63-65, 74-93).  Just as in *Chanel*, Activision's employees realized that: (1) the HUMVEE® Trade Dress was protected intellectual property, and (2) Activision did not have authorization from the makers of HUMVEE® vehicles to use that trade dress.  Notwithstanding, just like the defendants in *Chanel*, Activision's employees turned a blind eye and continued to use the HUMVEE® Trade Dress in marketing and merchandise as well as the *Call of Duty* Games, ███████████████████████████

███  *See also supra* at 10.

Moreover, even assuming Activision thought it had a right to use the HUMVEE® Trade Dress in its video games, it could not have reasonably thought it had the right to do so in advertising, toys, live events, or contests.  The limited free speech protection established in *Rogers v. Grimaldi*, 875 F.2d 994, 998-1000 (2d. Cir. 1999), extends only to qualifying expressive works—not commercial speech.  *See Yankee Pub. Inc. v. News America Pub. Inc.*, 809 F. Supp. 267, 276 (S.D.N.Y. 1992) ("Free speech rights do not extend to labelling or advertising products in a manner that conflicts with the trademark rights of others" under *Rogers*); *see also Donahue v. Artisan Entm't, Inc.*, 2002 WL 523407, at *7 n.5 (S.D.N.Y. Apr. 8, 2002) (noting that *Rogers* concerned a movie and not use of a trademark for "trade or advertising").   Even if Activision thought it had a right to use the HUMVEE® Trade Dress in its video games, it could not have thought it had the right to use it in advertisements or to sell toy replicas of the HUMVEE® vehicle.  In fact, Activision's witnesses have admitted that the

company knew ████████████████████████ For example, ████████████████████████

████████████████████ admitted that Activision ████████████████████████

████████████████████████████████████████████████████████████████████████████

████████ SUF ¶¶ 74-90.  And Activision's marketing personnel admitted that Activision ██

████████████████████████████████████████████████████████████████████████

████████████████████████████ *Id.* ¶¶ 63-65.  These undisputed facts show that

Activision used AM General's intellectual property knowing that it did not have the right to do

so.  That is textbook bad faith.  *See Chanel*, 795 F. Supp. 2d at 269-70.

*Third*, Activision's slavish copying of the iconic HUMVEE® Trade Dress, its use of

actual HUMVEE® vehicles at events promoting its *Call of Duty* Games (including by putting

Activision's own logos on the vehicle), and ████████████ actual HUMVEE® vehicles as

prizes for promotional contests, leave no doubt that it intended to associate the *Call of Duty*

Games with the HUMVEE® brand.   There can be no question that Activision intended to copy

the HUMVEE® Trade Dress and to benefit from associating itself with the HUMVEE® brand.

Activision created a slavish copy of the HUMVEE® Trade Dress.  *See supra* at 6-7.

Activision's designers ██████████████████████████ *id.* at 6 (citing SUF ¶ 34), ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████ *supra* at 6 (citing SUF ¶¶ 30-33).  Activision's vehicle designer admitted ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

*Supra* at 6 (citing SUF ¶¶ 36-38, 47).  This is because ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ *See supra* at 6 (citing SUF ¶ 46, 48, 35-

36, 38-39, 47); *see also* SUF ¶ 40.  As Activision's Vice President of Public Relations observed,

████████████████████████████████████████████████████████████████████

*See supra* at 7 (citing SUF ¶ 48).

████████████████████████████████████████████████  The

vehicle that appears in the *Call of Duty* Games, trailers, and strategy guides bears all of the trade

dress elements of the HUMVEE® Trade Dress.  *Supra* at 6 (citing SUF ¶ 35, 38). Activision

then replicated the use of the HUMVEE® Trade Dress across its marketing and merchandising

efforts ████████████████████████████████  *See supra* at 7-8 (citing SUF ¶ 56-

62 63-66).  Activision admitted ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████  *See supra* at 11.

Similarly, Activision's marketing executives made and executed extensive plans to

arrange for actual HUMVEE® military vehicles to be present at important public events related

to the launch and promotion of the *Call of Duty* Games.  *See* SUF ¶ 67 (citing Ex. 56 at

API163842 ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████ Ex. 57 at API164021 ████████████████

████████████████████████████████  ; Ex. 48 at API027428 ████████

████████████████████████████████████████████████

████████████████████████████████████████  Ex. 55 at

API246659 ██████████████████████████████████████████████

██████ Ex. 54 at API248504 ████████████████████████████

████████████████████ Ex. 95 at API165193 ████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████ Ex. 74 at

API184866 ██████████████████████████████████████████

Ex. 99 ███████████████████████████████████████████████

███████████████████████████████████████. When the U.S. military found

out about one plan, it informed Activision █████████████████████████

██████████████████████ *Id.* (citing Ex. 133; Ex. 4 at 141:21-142:18).  That did not

deter Activision from looking for ways to associate the HUMVEE® brand with its games for

promotional advantage.  *Id.* SUF ¶ 40.

Activision also participated in organizing a sweepstakes contest for what its key

marketing executives referred to as a "Humvee" give-away that would "broaden" the appeal of

the game beyond "hardcore" gamers.  *See supra* at 8-9 (citing SUF ¶¶ 71-73).

These are not the actions of someone who innocently created packaging for its product,

only to discover that it has the potential to be confused with the packaging of a senior trademark

owner.  No, Activision's calculated and persistent conduct are the actions of a trademark

predator.  Activision knew that it had no right to use AM General's HUMVEE® vehicle but

nonetheless sought in every way possible to copy its Trade Dress and then associate its video

games with the HUMVEE® brand and benefit from the goodwill in that brand.

In *Victorinox I*, the court held at the summary judgment stage that defendants were

"barred from invoking the doctrine of laches" because, in light of the defendants' slavish

copying of the defendant's mark, there was no genuine dispute as to whether their "infringement

was intentional."  114 F. Supp. 3d at 137.  The court found that the similarity between the

plaintiff and defendant's marks was "both striking and telling"—the defendants copied the

plaintiff's mark "element-for-element"—to the point that "such overwhelming resemblance …

could only have been the product of intentional mimicry."  *Id.* at 136-37.  The court's conclusion

was further supported by the fact that "defendants were aware of plaintiff's [mark] before commencing sale of the accused [products]." *Id.* at 137. Thus, in finding no genuine dispute of fact, the court reasoned that "the slavish copying of plaintiff's trade dress would indubitably require a finder of fact to conclude, as a matter of law, that defendant, by its imitation of plaintiff's trademark, intended to cause confusion." *Id.* at 141 (quoting *Venetianaire Corp. of Am. v. A & P Imp. Co.*, 302 F. Supp. 156, 160 (S.D.N.Y. 1969) *aff'd*, 429 F.2d 1079 (2d Cir. 1970)); *see also, e.g.*, *Spring Mills, Inc. v. Ultracashmere House*, Ltd., 689 F.2d 1127, 1134 (2d Cir. 1982) (finding, after bench trial, that as a result of defendants' slavish copying it was "virtually certain that defendants adopted their mark and trade dress for no other purpose than to obtain a free ride on the good reputation" of the plaintiff, who had an already "well-established name of a highly reputable product.").



copying the HUMVEE® Trade Dress "element-for-element," *Victorinox I*, 114 F. Supp. 3d at 136, down to the last detail. They did so ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ Activision did so because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See supra* at 4, 7 (citing ¶¶ 38, 48). Activision's "slavish copying" of AM General's mark, and its ▮▮▮▮▮▮▮ use of the real world HUMVEE® vehicle to promote its *Call of Duty* games, demonstrate that Activision intended to benefit from association with the HUMVEE® brand.

**Fourth**, Activision continued to infringe even after being sued. There is no genuine dispute that Activision continued to create and distribute infringing *Call of Duty* Games after

receiving notice from AM General that the *Call of Duty* Games contained infringing uses of the HUMVEE® Trade Dress. *See supra* at 11 (citing SUF ¶¶ 118-122). Activision not only continued selling infringing *Call of Duty* Games that it had already been distributing, it released a new infringing title—*Call of Duty: Modern Warfare Remastered*—which continued Activision's practice of using the HUMVEE® Trade Dress without AM General's permission. *See id.*

Courts have found that the defendant acted with bad faith on summary judgment, where, as here, a defendant continues production and sale of infringing products after being notified of the plaintiff's objection. In *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 600 (S.D.N.Y. 2010), for example, the court found that the defendant's "continued sale of counterfeit goods after receiving [plaintiff's] cease and desist letter establish[ed] willfulness in and of itself" at summary judgment. The defendant "did not order the removal of Fendi-branded goods from its shelves until after Fendi commenced" a lawsuit. *Id.* The court reasoned that "[c]ourts have repeatedly found willfulness where a defendant receives a cease and desist letter but continues the infringing conduct." *Id.* at 600-01.

Here, Activision persisted in its conduct even after being notified by the trademark holder—first through cease and desist correspondence, and then by the filing of a complaint— that its conduct was infringing. Rather than take its products off shelves, it continued *introducing* new infringing products to the marketplace, releasing the eighth infringing title nearly half a year after receiving AM General's first cease and desist letter.

## B.     Activision Cannot Point to the First Amendment to Justify Its Conduct

Activision has moved for summary judgment on the grounds that its conduct is shielded by the First Amendment because video games constitute non-commercial speech. Regardless of whether there is any merit to Activision's motion—and AM General's opposition will explain

that there is not—Activision may not also rely on any defense the First Amendment may afford its conduct to claim that its eyes-wide-open use of the HUMVEE® Trade Dress was not willful.

For Activision to attempt that, it would have to argue that it helped itself to AM General's intellectual property on the good faith belief that it had a right under the First Amendment to do so. But that would be another way of saying that Activision has been relying all along on the advice of its lawyers in its decisions to knowingly use the HUMVEE® Trade Dress without AM General's permission.

Activision has barred itself from doing so. It has expressly disclaimed any "advice of counsel" defense. SUF ¶ 116. In fact, Activision left itself no choice. Although its witnesses testified that the company's legal department was fully aware of each of Activision's unauthorized uses of the HUMVEE® Trade Dress in the *Call of Duty* games and advertising materials and (obviously) knew it lacked a license, *id.* ¶¶ 107-13, Activision blocked AM General from conducting any discovery into these issues on the grounds of attorney-client privilege. *See id.* ¶ 117. That was Activision's right. But Activision cannot invoke that right defensively and then allege offensively that it was acting in good faith on advice of counsel. *Arista Records LLC v. Lime Grp. LLC*, 2011 WL 1642434, at *2-3 (S.D.N.Y. Apr. 20, 2011) (a defendant may not submit testimony, evidence, or argument regarding a belief in the lawfulness of their conduct where they "have already blocked inquiry on the basis of privilege," irrespective of whether the defendant calls the defense "advice of counsel" or not); *see also E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2000) ("Having blocked his adversary from conducting discovery on this issue, [defendant] will not now be heard to advance reliance on counsel."), *aff'd*, 4 F. App'x 81 (2d Cir. 2001).

This is particularly true when the question of willful infringement is at issue. *See., e.g.*, *UMG Recordings, Inc. v. MP3.Com, Inc.*, 2000 WL 1262568, at *3–4 (S.D.N.Y. Sept. 6, 2000)

(finding willful infringement where defendant, who did not assert advice of counsel defense and claimed that its actions were protected from copyright infringement as "fair use," "proffered no credible evidence" to rebut "proof that defendant knew at all times that its copying . . . was presumptively unlawful")

Activision cannot disclaim that what it did was unintentional (to avoid a finding of willful infringement) at the same time that it is asserting that it did what it did on purpose (because it thought it had a First Amendment right to use the HUMVEE® Trade Dress without AM General's permission). Activision is stuck with the facts that it claims in its motion are undisputed, that is, that it intentionally used the HUMVEE® Trade Dress without AM General's permission. *See id.*

In *Victorinox II*, the Second Circuit affirmed summary judgment on willful infringement and dismissal of the laches defense on the basis that the defendants engaged in a "pattern of duplicating Plaintiff's products," which continued even after authorities seized the products, giving rise to the plaintiff's lawsuit. 709 F. App'x at 49-50. Defendant did not deny these facts; rather, it claimed—without asserting the advice of counsel defense—that it relied on a legal decision concerning whether the allegedly infringed trademark was protectable, and thus argued that it acted in good faith because it did not believe it was using a protected mark. *See id.* The Second Circuit rejected this argument, at the summary judgment stage, reasoning that it "fails to raise a genuine issue of material fact as to Defendants' bad faith." *Id.*

As with the defendant in *Victorinox II*, in light of Activision's disavowal of an advice of counsel defense and its assertion of the attorney-client privilege, Activision has barred itself from offering evidence or arguing that it somehow acted in good faith and was not an intentional infringer of the HUMVEE® Trade Dress.

# CONCLUSION

For the foregoing reasons, Plaintiff is entitled to prevail on Defendants' laches

affirmative defense.

Dated: May 31, 2019

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: _____

Robert M. Schwartz
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
robertschwartz@quinnemanuel.com

Michael B. Carlinsky
Cory D. Struble
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000
Fax: (212) 849-7100
michaelcarlinsky@quinnemanuel.com
corystruble@quinnemanuel.com

*Attorneys for Plaintiff AM General LLC*