UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AM GENERAL LLC, | CASE NO. 1:17-cv-08644-GBD |
| Plaintiff, | |
| v. | |
| ACTIVISION BLIZZARD, INC., ACTIVISION PUBLISHING, INC., and MAJOR LEAGUE GAMING CORP., | |
| Defendants. | |

**MEMORANDUM OF LAW OF DEFENDANTS ACTIVISION BLIZZARD, INC., ACTIVISION PUBLISHING, INC., AND MAJOR LEAGUE GAMING CORP. IN OPPOSITION TO PLAINTIFF AM GENERAL LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' LACHES AFFIRMATIVE DEFENSE**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................ 1

AMG'S BURDEN ON ITS MOTION FOR SUMMARY JUDGMENT ...................................... 3

ARGUMENT ...................................................................................................... 4

I.     ACTIVISION DID NOT ENGAGE IN TRADEMARK INFRINGEMENT, FAR
LESS "WILLFUL INFRINGEMENT." ....................................................................... 4

     A.     Activision Did Not Intend To Mislead Consumers Via The Accused Games
Or Their Marketing. .................................................................................... 6

          1.     Activision's Depiction Of Humvees In Its Games Was For An
Expressive Purpose, Not A Deceptive One. .................................. 6

          2.     The Inclusion Of In-Game Scenes Depicting Humvees In Preview
Trailers Does Not Reflect An Intent To Confuse Or Mislead. ................. 10

          3.     Activision Did Not "Arrange" For Any Humvee To Appear At A Live
Event; Regardless, That Would Not Reflect An Intent To Mislead. ........ 13

     B.     AMG's Contentions Concerning Activision's Purported "Knowledge" Are
Misleading And Irrelevant. .......................................................................... 16

     C.     Internal Discussions Concerning *Call of Duty* Merchandise Do Not Reflect
An Intent To Confuse Or Mislead. ................................................................. 22

II.     AMG'S "ADVICE OF COUNSEL" ARGUMENT IS A RED HERRING.................... 24

CONCLUSION.................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*1-800 Contacts, Inc. v. WhenU.Com, Inc.*,
414 F.3d 400 (2d Cir. 2005)......................................................................22

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970)......................................................................3. 4

*Arista Records LLC v. Lime Group LLC*,
2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011)..........................................25

*Brown v. Electronic Arts, Inc.*,
724 F.3d 1235 (9th Cir. 2013) ..................................................................23

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)..................................................................................20

*Caterpillar Inc. v. Walt Disney Co.*,
287 F. Supp. 2d 913 (C.D. Ill. 2003) .........................................................8

*Chanel, Inc. v. Veronique Idea Corp.*,
795 F. Supp. 2d 262 (S.D.N.Y. 2011).......................................................18

*Charles Atlas, Ltd. v. DC Comics, Inc.*,
112 F. Supp. 2d 330 (S.D.N.Y. 2000)...................................................8, 16

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*,
886 F.2d 490-95 (2d Cir. 1989) .............................................................7, 23

*Cumberland Packing Corp. v. Monsanto Co.*,
140 F. Supp. 2d 241 (E.D.N.Y. 2001) ........................................................6

*Cummings v. Soul Train*,
67 F. Supp. 3d 599 (S.D.N.Y. 2014)........................................................11

*Desly Int'l Corp. v. Otkrytoe Aktsionernoe Obshchestvo 'Spartak'*,
2017 WL 5157614 (E.D.N.Y. Nov. 6, 2017)..........................................5, 10

*Disney Enterprises, Inc. v. Sarelli*,
322 F. Supp. 3d 413 (S.D.N.Y. 2018)........................................................17

*E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*,
90 F. Supp. 2d 277 (S.D.N.Y. 2000), *aff'd*, 4 F. App'x 81 (2d Cir. 2001)............................25

## TABLE OF AUTHORITIES
*(Continued)*

**Page(s)**

*F.D.I.C. v. Giammettei*,
 34 F.3d 51 (2d Cir. 1994)..................................................................................4

*Giannullo v. City of New York*,
 322 F.3d 139 (2d Cir. 2003)..............................................................................4

*Girl Scouts v. Bantam Doubleday Dell Pub. Group*,
 808 F. Supp. 1112 (S.D.N.Y. 1992), *aff'd*, 996 F.2d 1477 (2d Cir. 1993) ...................8, 17, 23

*Gottlieb Development LLC v. Paramount Pictures Corp.*,
 590 F. Supp. 2d 625 (S.D.N.Y. 2008)..............................................................8

*Guthrie Healthcare Sys. v. ContextMedia, Inc.*,
 2014 WL 185222 (S.D.N.Y. Jan. 16, 2014) ....................................................6

*Holtz v. Rockefeller & Co., Inc.*,
 258 F.3d 62 (2d Cir. 2001)................................................................................4

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
 73 F.3d 497 (2d Cir. 1996)................................................................................7

*Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc.*,
 1999 WL 108739 (S.D.N.Y. Mar. 3, 1999) ....................................................10

*Louis Vuitton Mallatier S.A. v. Warner Bros. Entertainment, Inc.*,
 868 F. Supp. 2d 172 (S.D.N.Y. 2012)..........................................................8, 11

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
 209 F. Supp. 3d 612 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017)...................4, 10

*MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*,
 2004 WL 434404 (S.D.N.Y. Mar. 8, 2004) ......................................................5

*McDermott, Inc. v. AmClyde*,
 511 U.S. 202 (1994)........................................................................................17

*Meese, Inc. v. Int'l Leisure Prod., Inc.*,
 2003 WL 22902594 (S.D.N.Y. Dec. 9, 2003) ..................................................6

*Meta-Film Associates, Inc. v. MCA, Inc.*,
 586 F. Supp. 1346 (C.D. Cal. 1984) ...............................................................23

*Mil-Spec Monkey, Inc. v. Activision Blizzard, Inc*,
 74 F. Supp. 3d 1134 (N.D. Cal. 2014) ..............................................................2

# TABLE OF AUTHORITIES
*(Continued)*

**Page(s)**

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
269 F.3d 114 (2d Cir. 2001) ................................................................................10

*Novalogic, Inc. v. Activision Blizzard*,
41 F. Supp. 3d 885 (C.D. Cal. 2013) ..............................................................2, 20

*Page v. Something Weird Video*,
960 F. Supp. 1438 (C.D. Cal. 1996) ...................................................................11

*Procter & Gamble Co. v. Colgate-Palmolive Co.*,
1998 WL 788802 (S.D.N.Y. Nov. 9, 1998), *aff'd*, 199 F.3d 74 (2d Cir. 1999) .....................21

*Procter & Gamble Co. v. Johnson & Johnson Inc.*,
485 F. Supp. 1185 (S.D.N.Y. 1979), *aff'd*, 636 F.2d 1203 (2d Cir. 1980) ............................21

*Radio Channel Networks, Inc. v. Broadcast.com, Inc.*,
1999 WL 124455 (S.D.N.Y. 1999), *aff'd*, 201 F.3d 432 (2d Cir. 1999) ................................17

*Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*,
926 F.2d 134 (2d Cir. 1991) ................................................................................14

*Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div.
of Travel Dev.*,
955 F. Supp. 598 (E.D. Va. 1997) .......................................................................21

*Rogers v. Grimaldi*,
695 F. Supp. 112 (S.D.N.Y. 1988) ......................................................................11

*Rogers v. Grimaldi*,
875 F. 2d 994 (2d Cir. 1989) ................................................................................8

*Star Indus., Inc. v. Bacardi & Co., Ltd.*,
412 F.3d 373 (2d Cir. 2005) .................................................................................5

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
588 F.3d 97 (2d Cir. 2009) ..................................................................................6

*Strange Music, Inc. v. Strange Music, Inc.*,
326 F. Supp. 2d 481 (S.D.N.Y. 2004) .................................................................21

*Tiffany & Co. v. Costco Wholesale Corp.*,
127 F. Supp. 3d 241 (S.D.N.Y. 2015) ...................................................................9

# TABLE OF AUTHORITIES
*(Continued)*

**Page(s)**

*Toni & Guy (USA) Ltd. v. Nature's Therapy, Inc.*,
  2006 WL 1153354 (S.D.N.Y. May 1, 2006) ............................................................5

*Trebor Sportswear Co. v. The Limited Stores, Inc.*,
  865 F.2d 506 (2d Cir. 1989)................................................................................17

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
  2000 WL 1262568 (S.D.N.Y. Sept. 6, 2000)........................................................25

*Victorinox AG v. B&F System, Inc.*,
  114 F. Supp. 3d 132 (S.D.N.Y. 2015).....................................................................9

*Victorinox AG v. B&G System, Inc.*,
  709 F. App'x 44 (2d. Cir. 2017) ...........................................................................25

*Wham-O, Inc. v. Paramount Pictures Corp.*,
  286 F. Supp. 2d 1254 (N.D. Cal. 2003) ............................................................12, 13

*Yankee Publishing, Inc. v. News America Pub., Inc.*,
  809 F. Supp. 267 (S.D.N.Y. 1992) ......................................................................4, 8

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(c) ............................................................................................3

Local Civil Rules of the United States District Courts for the Southern and
  Eastern Districts of New York, Rule 56.1 ...............................................................4

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:5 (5th ed.) ...............................22

## INTRODUCTION

The Motion of AM General LLC ("AMG") for Partial Summary Judgment, though ostensibly directed at Activision Publishing, Inc.'s and its affiliates' (collectively, "Activision")[1] laches defense, is in fact a thinly veiled effort to divert the Court's attention from the applicable law and the content of the actual games at issue in this lawsuit (the "Accused Games").[2]  At its core, AMG's Motion attempts to liken the depiction of realistic military vehicles in expressive works to a street vendor selling counterfeit merchandise.  The vast and obvious difference between, on the one hand, creating a digital image of a real product as part of an artistic work and, on the other hand, creating a knock-off product to purposefully cannibalize sales of the original highlights the weakness of AMG's argument and the absence of any relevant authority to support its position.

AMG's Motion is premised on its argument that Activision is barred from presenting its defense of laches because Activision acted "willfully."  As set forth in Activision's own Motion for Summary Judgment (Dkt. 131), Activision cannot be liable for trademark infringement or related state law claims.  Accordingly, the Court need not decide the issues presented in this Motion.  However, to the extent this Motion is not mooted by a ruling on Activision's Motion, it should be denied, and summary judgment should be entered in *Activision's* favor on the issue of willfulness.  This is because in order for AMG to prove willfulness, it must establish that Activision intended to "capitalize" on "*confusion* between [Activision's] and [AMG's] product."

---

[1]  AMG's Motion purports to encompass all three defendants—Activision Publishing, Inc., Activision Blizzard, Inc., and Major League Gaming Corp.  However, AMG has not offered or cited to *any* evidence pertaining to Activision Blizzard, Inc. or Major League Gaming Corp.

[2]  The Accused Games are five console games *Call of Duty 4: Modern Warfare* (2007 and 2016 (remastered)), *Call of Duty: Modern Warfare 2* (2009), *Call of Duty: Modern Warfare* 3 (2011), *Call of Duty: Black Ops II* (2012), and *Call of Duty: Ghosts* (2014), and two mobile games, *Call of Duty: Mobilized* (DS) (2009) and *Call of Duty: Heroes*. AMG has not made clear whether the game *Call of Duty: Modern Warfare* (DS) (2007) is part of this lawsuit.

Mot. at 13 (emphasis added).  There is not a shred of evidence that Activision ever intended to "capitalize" on consumer confusion as to AMG's affiliation with, sponsorship of, or endorsement of any of the Accused Games.  Instead, what the evidence demonstrates (including AMG's own expert opinions) is that Activision depicted Humvees among hundreds of other real world objects in the Accused Games for the sole purpose of creating an authentic expressive work.  Further, Activision's actions were consistent with its intent to ***avoid*** any possible confusion.  For example, Activision prominently placed its own marks (and only its own marks) on all product packaging and marketing; depicted Humvees in a limited, contextual and logical manner and as just one of many real-life military vehicles; never included images of Humvees in any product packaging, posters, displays, banner ads or billboards; and never made any affirmative statements that could reasonably be read to suggest any affiliation between Activision and AMG. For these reasons (among others), two courts have already rejected the same argument AMG is making here, finding in those cases that Activision "made every effort to affirmatively negate any possible confusion," *Novalogic, Inc. v. Activision Blizzard*, 41 F. Supp. 3d 885, 901 (C.D. Cal. 2013), and never "affirmatively purported in any way to share a relationship," *Mil-Spec Monkey, Inc. v. Activision Blizzard, Inc.*, 74 F. Supp. 3d 1134, 1143 (N.D. Cal. 2014), with the unaffiliated third party plaintiffs.

The evidence AMG presents in its Motion, ***at best***, reflects the unremarkable (and undisputed) facts that the Humvees depicted in the Accused Games were intended to resemble real-life Humvees; that among the many gameplay videos and trailers for the Accused Games were a few that included gameplay moments from the Accused Games where Humvees were visible; ███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████     None of that proves that Activision intended to confuse

consumers about AMG's relationship to the Accused Games.

Moreover, *even if* a conclusion could be drawn from the evidence that Activision knew

that AMG purported to claim trademark rights in the Humvee name and appearance for military

vehicles and physical merchandise, it was reasonable for Activision to conclude that its

contextual and expressive use in its military *video games* was permissible, not only because the

law is clear on this issue (including court decisions on the very same Accused Games), but also

because hundreds of other similar entertainment products depicting Humvees have been released

to the public ████████████████████████   Indeed, even though the first of the Accused

Games was released in *2007*, AMG never contacted Activision until nine years later, and did not

file this lawsuit until *2017*. ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████   That is hardly the type of behavior one would

expect from a company that claims to possess strong trademark rights and seeks to place the

public on notice of those rights.

## AMG'S BURDEN ON ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine issue as to any material fact

and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  It is the

movant's burden to show that no genuine factual dispute exists and all reasonable inferences

must be drawn in the non-movant's favor.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157

(1970).[3]  Additionally, Rule 56.1 of the Local Rules of the United States District Courts for the

Southern and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for

summary judgment to submit a statement of the allegedly undisputed facts on which the moving

party relies, together with citation to the admissible evidence of record supporting each such

fact.[4]  "The local rule does not absolve the party seeking summary judgment of the burden of

showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not

itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz*

*v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001).  "[W]here the movant 'fail[s] to fulfill

its initial burden' of providing admissible evidence of the material facts entitling it to summary

judgment, summary judgment must be denied, 'even if no opposing evidentiary matter is

presented,' for the non-movant is not required to rebut an insufficient showing." *Giannullo v.*

*City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003) (quoting *Adickes*, 398 U.S. at 158).

## **ARGUMENT**

## I.     **ACTIVISION DID NOT ENGAGE IN TRADEMARK INFRINGEMENT, FAR LESS "WILLFUL INFRINGEMENT."**

"[Not] every unauthorized use of a protected mark is actionable." *Yankee Pub. Inc. v.*

*News America Pub. Inc.*, 809 F. Supp. 267, 272 (S.D.N.Y. 1992).  "The trademark owner's rights

are violated only where the unauthorized use has a substantial capacity to mislead consumers (or

other concerned actors in the marketplace) into a confusion as to the entity furnishing the goods

---

[3]  AMG is not arguing that Activision's laches defense fails as a matter of law due to an absence of evidence concerning an essential element of that defense (*e.g.*, delay and/or prejudice to Activision).  Indeed, AMG has never credibly explained its lengthy delay in filing this lawsuit.  The sole basis for AMG's Motion is its contention that Activision's alleged infringement was willful—an issue on which AMG bears the burden.  *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 685 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017) ("The burden of proving bad faith rests with the party claiming infringement.") (citation omitted).  AMG's citation to *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994), is therefore inapposite.  Mot. at 12.

[4]  As set forth in Activision's concurrently filed Motion to Strike, many of the statements included in AMG's Rule 56.1 Statement ("SUF") are improper, unsupported, and/or misleading, and therefore, should be disregarded entirely.

or services." *Id.* at 272-73.  Thus, for infringement to be "willful" or in "bad faith," the "junior user of a mark [must seek] to exploit the good will and reputation of a senior user … **with the intent to sow confusion** between the two companies' products."  *Star Indus., Inc. v. Bacardi & Co., Ltd.*, 412 F.3d 373, 388 (2d Cir. 2005) (emphasis added); *MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*, 2004 WL 434404, at *4 (S.D.N.Y. Mar. 8, 2004) (Daniels, J.) ("The relevant intent in this inquiry is whether the alleged infringer intended 'to palm off his products as those of another.'"); *Toni & Guy (USA) Ltd. v. Nature's Therapy, Inc*., 2006 WL 1153354, at *10 (S.D.N.Y. May 1, 2006) (bad faith requires that the defendant "sought to confuse consumers about the source of their product[s]"); *Desly Int'l Corp. v. Otkrytoe Aktsionernoe Obshchestvo "Spartak"*, 2017 WL 5157614, at *7 (E.D.N.Y. Nov. 6, 2017) ("willful infringement cases all seem centered on the plaintiff's proof of the defendant's intent to deceive somebody in the marketplace.").

AMG never makes any serious attempt to prove that Activision intended to confuse consumers.  Instead, AMG conflates the intent to depict with the intent to deceive, and the desire to advertise game content with the desire to confuse consumers.  AMG then attempts to support its argument by citing to a few counterfeiting cases and incorrectly concluding that any intentional use of an object or term in which someone claims trademark rights is bad faith.  Review of the relevant case law and the actual undisputed facts confirms that Activision's creation and depiction of imaginary virtual Humvees in its computer-generated world does not bear even the slightest resemblance to the deliberate product counterfeiting that courts have held to constitute "bad faith."

### A.   Activision Did Not Intend To Mislead Consumers Via The Accused Games Or Their Marketing.

1.   Activision's Depiction Of Humvees In Its Games Was For An Expressive Purpose, Not A Deceptive One.

AMG devotes much of its Motion to establishing that Humvees did not end up in the Accused Games "by accident," and then attempts to twist that fact into evidence of willfulness. Mot. at 5-18.  Activision does not dispute that it based its depiction of Humvees and other military vehicles in the Accused Games on images of their real-life counterparts, ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████  But "[t]here is a considerable difference between an intent to copy and an intent to deceive." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117 (2d Cir. 2009).  *See also Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 2014 WL 185222, at *7 (S.D.N.Y. Jan. 16, 2014) ("Even deliberate copying of a mark does not necessarily indicate that the defendant acted in bad faith, if there was no intent to deceive."); *Cumberland Packing Corp. v. Monsanto Co.*, 140 F. Supp. 2d 241, 255 (E.D.N.Y. 2001) ("Even if defendant did copy certain elements of plaintiff's trade dress, . . . copying *per se* does not prove bad faith in determining confusion.  For copying to be evidence of confusion the defendant must have copied for the purpose of causing confusion.").  AMG's "repeated insistence that [Activision] slavishly copied its product cannot substitute for the lack of any competent evidence of" bad faith.  *Meese, Inc. v. Int'l Leisure Prod., Inc.*, 2003 WL 22902594, at *4 (S.D.N.Y. Dec. 9, 2003).

AMG does not assert, nor can it, that when Activision referenced images of military vehicles to make its digital models, Activision intended to deceive or confuse consumers as to the source or sponsorship of the Accused Games.  To the contrary, AMG admits that Activision's intent was to build an authentic and convincing virtual world for its players to

6

experience and explore; realistic-looking Humvees were just a small part of that effort, as AMG

and its ***own*** expert readily conceded.  *See* Declaration of Cory D. Struble [Dkt. 141] ("Struble

Decl."), Ex. 21[5], ¶ 149 █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████") (emphasis in original); Mot. at 5 ("Activision intended to ████████

█████████████"), 6 ("████████████████████████████"); 7 ("[R]ealism … was an

important component of the success and competitive position of the *Call of Duty* Games in the

marketplace.").  *See also* Ex. 91 (API025934) (████████████████████

████████████████); SUF ¶¶ 42-43 (███████████████████████████████

███████); Activision's Statement of Additional Material Undisputed Facts ("SAMF"), ¶¶ 1-

5.[6]

    AMG does not cite to a single case (and Activision is not aware of any such case) in

which a court held that the realistic depiction of a product in an expressive work was trademark

infringement—far less "bad faith" or "willful" infringement.  Indeed, courts routinely hold that

reproducing a trademark for an expressive purpose is a ***good faith*** use.  *See, e.g.*, *Cliffs Notes,*

*Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490, 492-95 (2d Cir. 1989) (defendant

"readily admitted that it copied the prominent features of Cliffs Notes," but the "primary intent"

---

[5]  Unless otherwise stated, all citations to Exhibit ("**Ex.**") numbers refer to the exhibits to the Struble Declaration.

[6]  AMG's unsupported assertion that Activision gave undue prominence to Humvees is contradicted by the ***games themselves***.  Tellingly, when *Modern Warfare* was approaching release, Activision did not even mention Humvees among the game's "features."  *See* Ex. 73 (██████████████████████████████████████████████████████████████████).  Even when Humvees were mentioned in the documents, it was simply to illustrate that the games depict modern combat in ***all*** of its forms.  *See, e.g.*, Ex. 49 ██████████████████████████████████████████████████████████████).  *See also, e.g.*, SAMF ¶¶ 23-28; Activision's Responses to SUF ("Responses to SUF") ¶¶ 15-19, 56-62.

of the use was for an expressive or artistic purpose); *Charles Atlas, Ltd. v. DC Comics, Inc.*, 112 F. Supp. 2d 330, 338-40 (S.D.N.Y. 2000) (admission that defendant engaged in "direct copying of the art and dialogue of plaintiff's trademark comic ad" did not establish bad faith); *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 505 (2d Cir. 1996) (no bad faith despite intent to copy "Spam" trademark, because the defendant's artistic purpose "depends on consumer recognition").[7]  That is true even if the expressive use *also* has a commercial purpose, such as to make the work more appealing to potential customers.[8]  *See Rogers v. Grimaldi*, 875 F. 2d 994, 998 (2d Cir. 1989) ("Titles, like the artistic works they identify, are of a hybrid nature, combining artistic expression and commercial promotion.").[9]

---

[7]  *See also, e.g.*, *Yankee Pub.*, 809 F. Supp. at 275 ("*New York* has made a strong showing that it used an imitation of Yankee's trademark cover in good faith as part of a joking commentary on the economic times, and not as an attempt to misuse or abuse Yankee's trademark rights ….  There was no intention to create confusion or to free ride on the goodwill associated with Yankee's mark.); *Louis Vuitton Mallatier S.A. v. Warner Bros. Entm't, Inc.*, 868 F. Supp. 2d 172, 178-79 (S.D.N.Y. 2012) (defendant intended to depict a Louis Vuitton bag and to refer to it as a "Louis Vuitton"); *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 625, 635 (S.D.N.Y. 2008) (defendant intentionally placed plaintiff's product in the film, but "[t]here is no indication that [defendant] deliberately placed the [product] into the scene to capitalize on the good will associated with [plaintiff's mark"); *Girl Scouts of U.S. of Am. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 808 F. Supp. 1112, 1129 (S.D.N.Y. 1992), *aff'd*, 996 F.2d 1477 (2d Cir. 1993) ("The fact that Defendants decided to publish a series of books about a scouting organization and to use the word 'scouts' in the title as part of a description of the books' content does not establish bad faith."); *Caterpillar Inc. v. Walt Disney Co.*, 287 F. Supp. 2d 913, 919 (C.D. Ill. 2003) (fact that products and trademarks "appeared in [movie] without authorization" is not bad faith in the "absence of any indication of Defendants' intent to somehow poach or free-ride on the fame and goodwill of Caterpillar's trademarks").

[8]  AMG's oxymoronic statement that Activision's End-User License Agreement ("EULA") "unequivocally impl[ies]" that Humvees were owned or licensed by Activision is without merit.  The EULA never purports to assert ownership over any third party intellectual property depicted in the game – only the video game "Program" and its components.  When third party intellectual property rights are licensed by Activision, that fact is explicitly stated in the game manual.  *See, e.g.*, SAUF ¶ 44; Ex. 120 ("'Jeep,' 'Wrangler' and 'Rubicon' are registered trademarks of, and used with permission of Chrysler Group, LLC."); Ex. 118, at AMG75791 ("Fonts licensed from T26, Inc").

[9]



Activision's effort to depict Humvees realistically and faithfully in the Accused Games could not be more different from the counterfeiting at issue in *Tiffany & Co. v. Costco Wholesale Corp.*, 127 F. Supp. 3d 241 (S.D.N.Y. 2015) and *Victorinox AG v. B&F System, Inc.*, 114 F. Supp. 3d 132 (S.D.N.Y. 2015). In *Tiffany*, the defendant's copying was motivated by the intent to mislead consumers and induce them to purchase diamond rings that were "nearly identical" to those sold by Tiffany. 127 F. Supp. 3d at 249. Thus, the defendant not only copied the design of the rings, but also used the "Tiffany" brand name in a misleading manner (namely, "in a manner similar to the way that Costco would display the manufacturer or source of other types of goods") and created packaging intended to give the counterfeit rings a "Tiffany or upscale look." *Id*. at 248-49. Likewise, in *Victorinox*, the defendant created knives intended to look like Swiss Army knives, including by duplicating the product design and configuration, the Swiss Army logo and distinctive red color, and the look and size of the packaging. 114 F. Supp. 3d at 136. In fact, certain of the defendants' knives were so obviously infringing they had been seized by the U.S. Customs Service. *Id.*

AMG's attempt to analogize the depiction of a real product as part of an artistic work with creating a knock-off product to purposefully cannibalize sales of the original underscores the infirmity of AMG's Motion. No one will purchase a video game Humvee instead of a real Humvee, and no matter how realistic Activision's virtual Humvees look, they will never replace or substitute for the physical product. And unlike the defendants in *Tiffany* or *Victorinox*, Activision did not place AMG's trademarks or trade dress anywhere on the packaging or exterior of the Accused Games. SAMF ¶ 23. Nor did Activision make any statement, explicitly or otherwise, that AMG was a sponsor or otherwise affiliated with the Accused Games. Instead, Activision prominently displayed its own trademarks in connection with the Accused Games,

underscoring its good faith intentions.  SAMF ¶ 24.  *See also Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 125 (2d Cir. 2001) ("[B]y placing its labels prominently upon its bottles, [defendant] negated an inference of intent to deceive consumers as to the source of its product."); *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 674 ("That LV prominently displayed its own logos on the OTR Sneaker further undermines the notion that it sought to pass the shoes off as LVL XIII's."); *Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc.*, 1999 WL 108739, at *1 (S.D.N.Y. Mar. 3, 1999) ("In view of the manner of display and labeling, and the prominent use of the [defendant's] marks, there would be little, if any, motivation for bad faith appropriation of plaintiff's mark by defendant."); *see also Desly Int'l Corp.*, 2017 WL 5157614, at *7 ("The fact that Desly placed its own name and logo, front and center, on the accused products, in much larger and more prominent font than Spartak's, strongly suggests that it was trading on its own name and not any willful infringement of Spartak's mark.").[10]

### 2.   The Inclusion Of In-Game Scenes Depicting Humvees In Preview Trailers Does Not Reflect An Intent To Confuse Or Mislead.

AMG also makes much of its assertion that actual gameplay footage that included depictions of Humvees made its way into a small number of trailers or promotional videos for the Accused Games.  Mot. at 6-8.  What AMG ignores is that the vast majority of Activision's trailers and promotional videos for the Accused Games did not include any depictions of Humvees, SAMF ¶ 26, completely undermining any assertion that Activision "highlighted" Humvee vehicles in its marketing.  *See also id.* ¶¶ 25, 27-28.  In any event, Activision's inclusion in preview trailers of brief ***in-game*** images that include glimpses of Humvees (among many other vehicles and objects) does not indicate an intent to mislead, deceive, or confuse

---

[10]  Contrary to AMG's assertion, there is no evidence that Activision intended to promote an association with AMG in the strategy guides for the Accused Games.  The strategy guides merely depict the content of the Games through thousands of still images.  SAMF ¶¶ 29-32.  Humvees are depicted in only a tiny fraction of these images.

customers.[11]  "It would be illogical" to allow Activision to create and sell its video game but "effectively preclude any advance discussion or promotion" of its constitutionally protected work.  *Page v. Something Weird Video*, 960 F. Supp. 1438, 1444 (C.D. Cal. 1996) (citation omitted).  Under AMG's theory, the defendants in *Rogers v. Grimaldi*, 695 F. Supp. 112, 114 (S.D.N.Y. 1988), *aff'd* 875 F.2d 994, would not have been able to create posters or placards advertising *Fred and Ginger*; the defendants in *Louis Vuitton*, 868 F. Supp. 2d at 175, would not have been able to include the amusing "Louis Vuitton" scene in their trailers; and the defendants in *Cummings v. Soul Train Holdings LLC*, 67 F. Supp. 3d 599, 601 (S.D.N.Y. 2014), would not have been able to run "televised advertisements and Internet videos" depicting the plaintiff's performance.  But they did—and were entitled to do—all of those things.[12]

The handful of internal Activision emails referenced by AMG do not change this analysis. ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

Nothing in the emails suggests that Activision intended to confuse its audience or to create the false impression that AMG sponsored or endorsed *Modern Warfare 2*—or, for that matter, any other Accused Game.

---

[11]  AMG falsely claims that Humvees can be seen in "24 promotional trailers."  SUF ¶ 56.  However, AMG's Motion only refers to trailers from *Modern Warfare 2*.  The vast majority of trailers/videos for the Accused Games do not include any depictions of Humvees.  SAMF ¶ 26.

[12]  Indeed, in *Rogers*, "the Film's distributors may have conceived of and even executed a few schemes to exploit commercially the public's familiarity with Rogers' name[.]"  695 F. Supp. at 120.  The Court held even that conduct "does not turn either the film or its title into commercial speech" or deprive the defendants of their First Amendment rights.  *Id.*

AMG's claim that Activision "used HUMVEE® vehicles in advertising █████████" in its games is misleading. Mot. at 7. What the testimony ***actually*** says is that Activision's promotional ***trailers***, as a whole, "████████████████████████████." *See* Ex. 1 (Kostich Tr.), at 93:23-94:3.[13] That is a common-sense notion that has nothing to do with willfulness. There is simply no evidence that the inclusion of a brief game scene containing Humvees (among dozens of other scenes that had no Humvees) was intended to deceive consumers as to the game's source or sponsorship. Also false is AMG's assertion that Activision "continuously emphasized scenes" with Humvees in communications with the media or retailers. Mot. at 8. AMG does not identify a single "communication with the media" that supports this assertion. Instead, the evidence cited by AMG consists entirely of ████████ ██████████████████████████████████████████████████████████████ (Exs. 49, 81, 76), ████████████████████████████████████████████████████████████ ████████████████████████████████████████ (Ex. 32), and a ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ (Ex. 82).

*Wham-O, Inc. v. Paramount Pictures Corp.*, 286 F. Supp. 2d 1254 (N.D. Cal. 2003), is directly on point. In that case, the defendant featured the plaintiff's product (the Slip 'N Slide) in one of the most important scenes in its film. That scene then played a "prominent" role in

---

[13] AMG cites to a survey "██████████t" conducted by its expert, Yoram Wind, ███████ ██████████████████████████████████████████████████. Dr. Wind's "████████t" is improper, untimely, and flawed on its face. *See* Motion to Strike, at pp. 19-21; Declaration of E. Deborah Jay, Ph.D. dated July 2, 2019, ¶¶ 1-2 & Ex. A at 2-3, 13-24. Regardless, it is irrelevant. █████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████

advertising and promoting the film, including "in the film's publicly-released trailers"; "in related promotional materials"; "in the film's television advertisements"; "on the film's Internet website;" and even in "an interactive game named 'Dickie Slide' on the film's website."  286 F. Supp. 2d at 1258.  The Court nevertheless rejected the plaintiff's infringement claim:

> As any moviegoer can attest, it is not unusual for movie producers to use a signature scene—and the products and props therein—to cultivate interest in a film.  Films with car chases do so with cars; films with gunplay do so with firearms; films with *haute couture* wardrobes do so with clothing.  Nothing in the record suggests defendants' [defendants] used plaintiff's marks to imply that plaintiff placed its imprimatur on the film; nowhere in defendants' publicity efforts is plaintiff's mark unreasonably displayed or abused….  Defendants instead, use the marks and products in a specific and unique descriptive sense: to evoke associations with an iconic child's toy." *Id*. at 1264.

Likewise here, not one of the trailers for ***any*** of the Accused Games makes any reference to AMG (or the manufacturers of Humvees), far less "unreasonably display[s] or abuse[s]" AMG's alleged trademark or suggests that AMG placed its "imprimatur" on any of the Games.  SAMF ¶¶ 22, 26-28.  If anything, Activision's inclusion of Humvees in its marketing is much less prominent than the marketing at issue in *Wham-O*.  For example, unlike the trailers at issue in *Wham-O*, the word Humvee is never spoken or seen in any trailers or previews for the Accused Games, and in all but two trailers, Humvees either are not included or are virtually indiscernible.  *Id.*  Finally, Activision did not feature Humvees on its website, in any "related promotional materials," or in any web-based mini-game or interactive promotion.

      3.    <u>Activision Did Not "Arrange" For Any Humvee To Appear At A Live Event; Regardless, That Would Not Reflect An Intent To Mislead.</u>

Other than the trailers, AMG's only other basis for its assertion that Activision used Humvees to market or promote the Accused Games is its unfounded statement that Activision executives "made and executed extensive plans to arrange for actual HUMVEE® military

vehicles to be present at important public events related to the launch and promotion of the *Call of Duty* Games." Mot. at 19.  There is no evidence that Activision ever made or executed any such plans.  *See Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 141 (2d Cir. 1991) (no bad faith where plaintiff's "creative attempt to link events and acts in order to ascribe to [defendant] a bad motive rests only upon speculation and conjecture"); Responses to SUF ¶¶ 67-69.  Nor is there any evidence that Activision ever purchased, commissioned, leased, or procured a Humvee for the one event referred to in AMG's Motion that it claims occurred.  It did not.  SAMF ¶ 42.  Most of the documents relied on by AMG reflect only that ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

(Ex. 56) ████████████████████████████ (Exs. 54, 55) ████████████████████

████████████████████.  The other documents reflect that ████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████.[14]

In any event, in the two or three occasions when Activision or its event planners discussed Humvees in connection with live events, it was not to showcase Humvees as a feature of the Accused Games or suggest a business relationship between Activision and AMG.

---

[14]  AMG also makes reference to occurrences ***outside*** the United States, such as an EB Games 2011 launch party in Canada for *Modern Warfare 3* (Ex. 128) ████████████████████████████████ (Ex. 57). Notably, the photograph of the EB Games party shared on Activision's Twitter page (Ex. 129) appears to have been viewed or "liked" by only a small handful of people.

Humvees were given as an ***example*** of a prop that might be used to help create a military theme for a convention booth or outdoor party.  For example, ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████ Ex. 56.  *See also* Ex. 74 ████████████

██████████████ ).  Mere discussions (without actual execution) about bringing military vehicles to a military-themed event cannot possibly reflect an intent to confuse.  Any event with a military theme logically would include real-life military vehicles.  Moreover, in contrast to the contemplated use of Humvees as part of a broader set design, when an organization sponsored a live promotional event, Activision sought to (and did) make that sponsorship very clear.  SAMF ¶ 43; *see, e.g.*, Ex. 56 (suggesting "████████████████████").

Finally, AMG's evidence concerning a 2009 sweepstakes that included General Motors' Hummer (<u>not</u> AMG's Humvee) by video game retailer GameStop does not reflect a bad faith intent to confuse by Activision.  Mot. at 9.  In the GameStop sweepstakes (which lasted for less than a month), people who pre-ordered *Modern Warfare 2* from GameStop were entered to win a variety of prizes, including a snowmobile, a motorcycle, a Zodiac boat, a Hummer H2, and "██

███████████."  Activision was not the organizer of that sweepstakes.[15]  SAMF ¶ 42.

AMG also ignores that Hummers are a brand of vehicle owned and sold by ***General Motors***, not AMG.[16]  SAMF ¶ 8.  General Motors or one of its dealers necessarily gave or sold the vehicle to

---

[15] In its "Preliminary Statement," AMG erroneously asserts that Activision "designed" this contest.  AMG does not support this false assertion with any evidence, and there is none.  *Compare* Mot. at 2 ("Activision even designed *Call of Duty* contests"), *with id.* at 9 ("████████████████████ promotional contests").  *See* SAMF ¶ 47 (sweepstakes rules identifying GameStop as sole sponsor); Responses to SUF ¶¶ 71-72.

[16] In 1999, AMG sold to General Motors all trademark and trade dress rights in the civilian "Hummer" vehicle, which AM General concedes was a "civilian version" of a Humvee.  SAMF ¶ 8; Mot. at 2, 9.  For further

GameStop, and General Motors has never complained.  AMG's argument is thus that a third-party promotion involving a vehicle that AMG does not own or sell to the public reflects an intent by Activision to mislead consumers as to AMG's sponsorship or endorsement of an Activision product.[17]  That argument is, at best, disingenuous.

### B.    AMG's Contentions Concerning Activision's Purported "Knowledge" Are Misleading And Irrelevant.

AMG's other major argument is that Activision "knew it lacked the right" to depict Humvees in its game or related marketing, "but continued to use it anyway."  Mot. at 15-18, 21-22.  This is false.  Activision believed and continues to believe that it had and has the right to depict Humvees in its expressive works and that AMG has no enforceable trademark or trade dress rights in the Humvee.

To support its assertion, AMG largely relies on an unauthenticated 1998 letter in which AMG's former licensing agent purports to confirm an oral agreement to modify the depiction of a "Hummer" vehicle in a science-fiction game titled *Sin*.  Mot. at 16; Ex. 121. There is no evidence that AMG's agent ever sent the letter; that Activision received the letter; that the statements in the letter accurately reflect the parties' conversations; or that Activision ever made any of the modifications discussed in the letter.  But even assuming, *arguendo*, that the letter is accurate, Activision's voluntary accommodation of AMG's request cannot be deemed an admission that Activision "lacked the right" to depict a Hummer in that game—far less that it lacked the right to depict Humvees in the Accused Games ten years later.  *See Charles Atlas*, 112 F. Supp. 2d at 340 ("We refuse to infer bad intent from DC's decision to accommodate Atlas's

---

background, *see* Defendants' brief in support of their Motion for Summary Judgment (Dkt. 139) at 6 n.5, 11-12, 36.

[17] ████████████████████████████████████████████████████████████████████████████ Ex. 60. ██████████████████████████████████

request [to forego publication of a related book].").[18]  Further, the 1998 letter reflects only that AMG *claimed* to have undefined trademark rights related to Hummer or Humvee vehicles.  *See* Ex. 121.  It is well-established that "mere prior knowledge of Plaintiffs' marks" cannot be used "to infer an intent to 'promote confusion between the products or appropriate [Plaintiffs'] goodwill.'"  *Disney Enterprises, Inc. v. Sarelli*, 322 F. Supp. 3d 413, 437 (S.D.N.Y. 2018) (Daniels, J.) (citation omitted).  *See also Radio Channel Networks, Inc. v. Broadcast.com, Inc.*, 1999 WL 124455, at *5 (S.D.N.Y. 1999), *aff'd*, 201 F.3d 432 (2d Cir. 1999) (Plaintiff "must allege something more than mere knowledge of the claimed mark[.]").

In *Girl Scouts*, 808 F. Supp. at 1129, the plaintiff made the same argument AMG makes here, and the court easily rejected it.  There, the plaintiffs provided the court "numerous facts … elicited from Defendants, both prior to and during discovery, that Defendants acted with knowledge of Plaintiffs' organizations and their trademark rights[.]"  *Id*.  The court concluded none of that evidence "undermines Defendants' good faith" in producing their allegedly infringing book.  *Id*.  To the contrary, though "[t]he Boy Scouts and Girl Scouts are, indeed, well known and dear to generations of American youth … this fact does not prohibit Defendants from capitalizing on Plaintiff's mystique, so long as Defendants' effort does not unduly confuse the public as to the source."  *Id*.  Moreover, "[b]ecause Defendants could reasonably have concluded, as this Court concludes, that Plaintiffs did not possess the exclusive right to the words 'scout' and 'scouting,' thereby limiting the rights of others to publish books about a fictional

---

[18]  AMG's theory would mean that any time a company accused of infringement decided to voluntarily cooperate with a trademark owner (rather than litigating), such cooperation would be deemed an admission with respect to every product released by the company in the future.  That theory not only is absurd on its face, but would deter would-be litigants from working with each other to informally resolve claims without judicial intervention— something directly at odds with public policy.  *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 215 (1994) ("[P]ublic policy wisely encourages settlements[.]"); *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989) (noting the "public policy of encouraging settlements and avoiding wasteful litigation").

'scouting' organization, this Court cannot conclude that the Defendants acted in bad faith." *Id*. at 1128-29.

Likewise here, Activision could "reasonably have concluded" that whatever intellectual property rights AMG might possess, those rights did not allow AMG to prevent the depiction of Humvees in video games and other expressive works, especially works realistically depicting military activity. In the nine years between 1998 and 2007, hundreds of video games and other audiovisual works depicting Humvees had been released to the public without any indication of having been licensed or authorized. ████████████████████████████████████

████████████████ Moreover, in the nine years between the release of *Modern Warfare* in 2007 and AMG's demand letter in 2016, AMG never once communicated to Activision that it disapproved of the use of Humvees in the Accused Games. *See* SUF ¶¶ 14, 118; SAMF ¶ 19. Thus, at minimum, Activision was entirely reasonable in concluding that after 2007, AMG either did not believe that it possessed the right to prevent the use or that AMG had elected not to enforce whatever rights it might possess. That conclusion turned out to be correct, as the evidence now confirms that from 2000 to 2016, ██████████████████████████ ██████████████████████████████████████████ ████████████████████████████████. SAMF ¶¶ 9-20.

Activision's reasonable and wholly justified conclusion concerning AMG's purported trademark rights is very different from the circumstances present in *Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp. 2d 262 (S.D.N.Y. 2011). In *Chanel*, the defendants admitted that they sold fake Chanel-branded costume jewelry from their retail storefront. Attempting to compare this to the depiction of real-world military objects in an expressive work about modern combat fails from the outset. Further, while the *Chanel* court rejected the defendants' argument that

their conduct was justified because they saw others selling the same jewelry online, the court only did so because "Defendants have neither produced admissible evidence in support of this statement nor have they identified specifics regarding the circumstances surrounding the online searches." *Id.* at 270.  Here, there is undisputed evidence that AMG for decades has tolerated and acquiesced to expressive depictions of Humvees in some of the biggest movies and video games ever released.

The rest of the purported "evidence" that AMG claims reflects Activision's knowledge that it "lacked" the right to depict Humvees also does not support that assertion.

***First***, AMG points to █████████████████████████



█████████████████████████.  *See* Responses to SUF ¶¶ 27-28.

***Second***, AMG notes that the Accused Games depict some (non-military) cars or other consumer products (*e.g.*, soda cans, movie posters) without their respective brand names.  But Humvees are depicted in the Accused Games without any logos or branding either.  Indeed, since Humvees are not consumer vehicles and do not use any exterior branding (*e.g.*, hood ornaments, logos, brand names), Activision employees considered them to be just as "generic" as the other non-branded vehicles in the game.[19]  SAMF ¶¶ 6-7, 21; Response to SUF ¶¶ 12, 78 (████████ ████████████████████████).  In any event, because the Accused Games are realistic military games designed to immerse the player in an authentic world, it was a reasonable

---

[19] AMG misleads when it states that "Activision's Vice President of Public Relations observed" that ███████████████ ████████████████████████████."  Mot. at 19.  The testimony AMG cites for that proposition was not about military games such as *Call of Duty*, but about an entirely different genre of games (racing games).  *See* Response to SUF ¶ 48 and Ex. 4 at 81-82.

artistic decision to depict military vehicles with more realism and detail than consumer vehicles.

**Third**, AMG argues that, because Activision entered into licenses with **other** product manufacturers, Activision necessarily knew a license was required for its use of Humvees.  Mot. at 10.  The Supreme Court has directly rejected that argument.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994) (request for permission to use intellectual property "may simply have been made in a good-faith effort to avoid …. litigation.  If the use is otherwise fair, then no permission need be sought").  *See also Novalogic*, 41 F. Supp. 3d at 903 n.23 ("Prior licensing activity is never an admission that a license is required.").  Moreover, ██████████ ████████████████████████████████████.  *See* Responses to SUF ¶¶ 97-98.  ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████.  *See, e.g.*, Ex. 38, Recitals and ¶ 4.[20]

It also is unremarkable that Activision's SEC filing acknowledged the risk of claims related to the use of materials based on real-world examples, without commentary as to the validity of such claims.  Mot. at 10.  That risk was real, as this very case demonstrates.  This case also demonstrates that the mere fact that someone makes a claim does not mean that the claim has merit.  *See Procter & Gamble Co. v. Johnson & Johnson Inc.*, 485 F. Supp. 1185, 1201 (S.D.N.Y. 1979), *aff'd*, 636 F.2d 1203 (2d Cir. 1980) ("It is true of course that the defendant was aware of the plaintiff's claims and … chose to disregard them. This does not mean that the

---

[20] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████

defendant acted in bad faith."); *see also Procter & Gamble Co. v. Colgate-Palmolive Co.*, 1998
WL 788802, at *83 (S.D.N.Y. Nov. 9, 1998), *aff'd*, 199 F.3d 74 (2d Cir. 1999) ("It is not an
indication of bad faith that defendants proceeded with their plans … despite a concern that P &
G might mount a legal challenge.").  In fact, two other similar claims were filed against
Activision, and both were dismissed on summary judgment.

    *Fourth*, AMG's contention that "Activision's marketing personnel admitted that
Activision ███████████████████████████████████████████████████
████████████████████████████████████" (Mot. at 18) is particularly disingenuous.  The
email exchange that AMG cites (Exs. 40, 41) ███████████████████████████
████████████████ and had nothing to do with trailers for the Accused Games.  Indeed, the
emails cited by AMG were sent five years after the trailers at issue were created and aired.

    *Finally*, AMG berates Activision for not "tak[ing] its products off shelves" after AMG's
2016 correspondence.  Mot. at 22.  But "[e]vidence of a failure to discontinue [after receiving a
cease and desist letter] does not *per se* establish defendants' bad faith."  *Strange Music, Inc. v.
Strange Music, Inc.*, 326 F. Supp. 2d 481, 494 (S.D.N.Y. 2004).  Indeed, AMG's letter (which
was vague and did not address any specific game) ***never demanded*** that Activision remove its
products from the marketplace; only that it provide "████████████."  SAMF ¶ 45.  In any
event, Activision did not "ignore" AMG's letter.  Mot. at 11.  It provided a detailed response
(Ex. 116) outlining the reasons why it did not believe it was culpable, attaching the legal
authority that supports its position.  *See* SAMF ¶ 46; *Ringling Bros.-Barnum & Bailey Combined
Shows, Inc. v. Utah Div. of Travel Dev.*, 955 F. Supp. 598, 604 (E.D. Va. 1997) (no willful intent
where defendant had "good faith, reasonable belief that its use of [plaintiff's] slogan was entirely

lawful"). [21]

**C.   Internal Discussions Concerning *Call of Duty* Merchandise Do Not Reflect An Intent To Confuse Or Mislead.**

AMG's final argument is that Activision's bad faith intent is reflected by (1) ███

████████████████████████████████████████████████████

█████████████████ (Exs. 65-68), and (2)███████████████████

███████████████████████████████████████ (Ex. 59),

██████████████████ (Ex. 97), ███████ (Ex. 63).  The emails

AMG relies on involved no more than six people and did not involve any public communication.

Under AMG's novel theory, business and creative people could never reference trademarks in

internal brainstorming sessions without being deemed willful infringers, even if they never

intended to proceed with their ideas, always intended to avoid confusion in the ultimate product,

or always intended to seek legal approval for every proposed use.  *See* Ex. 69 ("████████

██████████████████████████"); Ex. 63 ("██████████████████

██████").  That is not, and has never been, the law.  4 McCARTHY ON TRADEMARKS AND

UNFAIR COMPETITION § 23:5 (5th ed.) ("In-house, private use where the trademark is not seen

publicly is not sufficient to constitute infringement."); *See 1-800 Contacts, Inc. v. WhenU.Com,

Inc.*, 414 F.3d 400, 409 (2d Cir. 2005) ("A company's internal utilization of a trademark in a way

that does not communicate it to the public is analogous to an individual's private thoughts about

a trademark. Such conduct simply does not violate the Lanham Act, which is concerned with the

use of trademarks in connection with the sale of goods or services in a manner likely to lead to

---

[21]  Activision did not "introduc[e] new infringing products to the marketplace" (Mot. at 22) after AMG's letter.  The "Remastered" version of 2007's *Call of Duty 4: Modern Warfare* was not a new game; it was an updated version of an existing one that had been widely available in the marketplace for the preceding nine years, without any complaint or objection from AMG.

consumer confusion as to the source of such goods or services."); *Meta-Film Associates, Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1361 (C.D. Cal. 1984) (while defendant considered plaintiff's title as a possible title for a television series, defendant never used the title publicly; such a "limited internal use" cannot support an unfair competition claim).

   Review of the correspondence and the actual products that Mega released to the public confirms that Activision never created, authorized, or intended to create or authorize the making of any Humvee "replicas" or other Humvee-branded merchandise.  With respect to the "Light Armor Firebase" and "Armored Vehicle Charge" construction sets, the evidence actually reflects that, at Activision's direction, Mega made significant ███████████████████████ ███████████" the vehicles in the construction sets from AMG-manufactured Humvees.  Ex. 70. These differentiations, which include a different front grille and hood, a different body shape, different doors, and a different trunk, were reflected clearly on product packaging and in all of Mega's marketing and promotional materials, ████████████████████████████ ██████████████████████████████.  *See, e.g.*, Ex. 94, 99, 109, 122; SAMF ¶¶ 35, 37-41.  As a result, the construction sets that were sold and marketed to the public by Mega reflect Activision and Mega's ***good faith*** intent to avoid confusion.  *See Cliffs Notes*, 886 F.2d at 496 ("[W]hile the cover of Spy Notes certainly conjures up the cover of Cliffs Notes, the two differ in many respects."); *Brown v. Electronic Arts, Inc.*, 724 F.3d 1235, 1246-47 (9th Cir. 2013) (changes made by defendant to the avatar's jersey number "surely … made consumers *less* likely to believe that [plaintiff] was involved"); *Girl Scouts*, 808 F. Supp. 2d at 1125 n.21 ("Many of the features of Defendants' fictional Pee Wee Scouts differ substantially enough that consumers would be likely to recognize these differences from the well-known Boy Scouts and Girl Scouts[.]").  Indeed, ██████████████████████████████████████

████████████████████████████████████████████. Ex. 99.

Finally, it is unclear how AMG could credibly claim that Activision "████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████. SAMF ¶¶ 33-34.  The

opposite is true.  ██████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████

## II.    AMG'S "ADVICE OF COUNSEL" ARGUMENT IS A RED HERRING.

In a last-ditch effort to avoid the facts and the evidence, AMG argues that Activision may

not rely on the First Amendment to argue that it acted in good faith.  AMG's argument

misconstrues the "advice of counsel" defense and incorrectly conflates it with Activision's

separate First Amendment defense.  Activision is not claiming that its conduct was not willful

because it was acting on the advice of its in-house counsel.  Instead, Activision's argument is

that it did not intend to confuse consumers and that its conduct was a reasonable and justifiable

exercise of its First Amendment right of free expression.

AMG's argument in this regard is once again premised upon its misguided attempt to

conflate an attempt to depict a product (which is not trademark infringement, much less willful

infringement), with an intent to use a trade dress in a manner designed to confuse consumers.

While Activision intended to realistically depict Humvee vehicles in the Accused Games, it did

not "intentionally use[] the HUMVEE® Trade Dress" or do so with any intent to confuse.  Mot.

at 24.  AMG's own admissions prove that Activision's intention was not to use any trade dress in

a confusing manner, but rather to make a realistic military video game.  Every Activision witness

deposed by AMG in this case confirmed this.

AMG's reliance on *Victorinox AG v. B&G Sys., Inc.*, 709 F. App'x 44 (2d. Cir. 2017), is

misplaced.  There (unlike here), the defendants had admitted to intentionally "duplicating" the

plaintiff's knives to create its own counterfeit products, and relied solely on earlier litigation

regarding the validity of the plaintiff's trade dress claims to excuse its conduct.  The *Victorinox*

Court did not even address whether the defendants were barred from asserting "advice of

counsel" or related defense; it simply found the claimed reliance on an earlier litigation to be

invalid because of interceding events.  *Id.* at 49.  Nor is this case similar to *Arista Records LLC

v. Lime Group LLC*, 2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011).  There, the defendant (in a

copyright infringement lawsuit) had tried to defend against claims of willfulness by claiming that

he believed his conduct was lawful, and then blocked any inquiry into the basis for that belief by

asserting privilege.  *Id*. at *2-3. [22]  Activision's good faith is not dependent on what its counsel

believed, and nothing precludes Activision from proving that it did not intend to sow confusion

as to AMG's endorsement of the Accused Games.  AMG received ample testimony and

documentary evidence confirming Activision's proper expressive intentions.  That is more than

sufficient to establish good faith.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted in Activision's favor.

---

[22] Also distinguishable is *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2000), *aff'd*, 4 F. App'x 81 (2d Cir. 2001), wherein the defendant's good faith arguments were actually based on his claim that he had acted upon advice of counsel, an argument that is not being asserted here.  In *UMG Recordings, Inc. v. MP3.Com, Inc.*, 2000 WL 1262568, at *4 (S.D.N.Y. Sept. 6, 2000), the defendant had not presented any arguments to overcome a claim of willfulness other than advice of counsel.

DATED:  New York, New York          Mitchell Silberberg & Knupp LLP
        July 5, 2019


                                    By: _____
                                        Lillian J. Lee (*l2l@msk.com*)
                                        Bradley J. Mullins (*bjm@msk.com*)
                                        437 Madison Avenue, 25th Floor
                                        New York, NY  10022
                                        Telephone: (212) 509-3900
                                        Facsimile:  (212) 509-7239

                                        -and-

                                        Karin G. Pagnanelli (*kgp@msk.com*)
                                        Marc E. Mayer (*mem@msk.com*)
                                        2049 Century Park East, 18th Floor
                                        Los Angeles, CA  90067-3120
                                        Telephone: (310) 312-2000
                                        Facsimile:  (310) 312-3100

                                        Attorneys for Defendants Activision
                                        Blizzard, Inc., Activision Publishing, Inc.,
                                        and Major League Gaming Corp.