UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AM GENERAL LLC,                                 :
                                                :
                            Plaintiff,          :
                                                :          MEMORANDUM DECISION
          -against-                             :              AND ORDER
                                                :
ACTIVISION BLIZZARD, INC., ACTIVISION           :           17 Civ. 8644 (GBD)
PUBLISHING, INC., and MAJOR LEAGUE GAMING       :
CORP.,                                          :
                                                :
                            Defendants.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

Plaintiff AM General LLC ("AMG") brings this action against Defendants Activision

Blizzard, Inc. and Activision Publishing, Inc. (collectively, "Activision") and Major League

Gaming Corp. ("MLG") for trademark infringement, trade dress infringement, unfair competition,

false designation of origin, false advertising, and dilution under the Lanham Act, 15 U.S.C.

§§ 1114, 1125, and 1125(c), respectively.  (Compl., ECF No. 1, ¶¶ 82–147.)  AMG also raises

pendent New York state law claims for trademark infringement, unfair competition, false

designation of origin, trade dress infringement, false advertising, and dilution.  (Id. ¶¶ 148–81.)

On May 31, 2019, Defendants moved for summary judgment on all of AMG's claims

pursuant to Federal Rule of Civil Procedure 56.  (Defs. Activision and MLG's Notice of Mot. for

Summ. J., ECF No. 131.)  On the same day, Plaintiff moved for partial summary judgment on

Defendants' laches claim pursuant to Federal Rule of Civil Procedure 56(a).  (Pl. AMG's Notice

of Mot. for Partial Summ. J., ECF No. 138.)  Subsequently, Defendants filed a motion to strike (1)

certain portions of Plaintiff's Rule 56.1 statement of material facts and (2) the "experiment"

contained in the rebuttal report of Plaintiff's expert, Dr. Yoran Wind ("MTS I").  (See Mem. of

Law of Defs. Activision and MLG's in Supp. of Their Mot. to Strike Pl. AMG's Local Rule 56.1

Statement and Wind Rebuttal Report, ECF No. 163.) Shortly thereafter, Defendants filed a motion to strike (1) certain portions of Plaintiff's opposition to Defendants' Rule 56.1 statement of material facts and counterstatement of additional facts, (2) the survey undertaken by Plaintiff's expert, Dr. Wind, and (3) documents submitted by Plaintiff in opposition to Defendants' motion for summary judgment ("MTS II"). (*See* Mem. of Law in Supp. of Defs. Activision and MLG's Mot. to Strike, ECF No. 194.)

Defendants' motion for summary judgment is GRANTED. Plaintiff's motion for partial summary judgment is DENIED. Defendants' motions to strike are DENIED, except GRANTED in part to strike those documents which were not produced during discovery.[1]

## I.    FACTUAL BACKGROUND

### A.    The Parties.

In 1983, the U.S. Department of Defense first awarded AMG a contract to build the High Mobility Multipurpose Wheeled Vehicle. (Pl. AMG's Response to Defs. Activision and MLG's Statement of Undisputed Facts and Counterstatement of Additional Facts ("Pl.'s Counter 56.1"), ECF No. 175, ¶ 20.) Since then, the vehicle—known colloquially as the "Humvee"—has been "the backbone of U.S. defense tactical vehicle fleets around the world" and "an essential part of

---

[1] For reasons stated in Part III(A)(2)(f), *infra*, Defendants' motion to strike portions concerning a letter sent by the Beanstalk Group to Activision in 1998 contained in Plaintiff's opposition to Defendants' Rule 56.1 statement is GRANTED. Beyond that, MTS II is DENIED as to Dr.'s Wind's survey because any defects that Defendants claim exist in Dr. Wind's report go to the weight of the evidence rather than to its admissibility. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (citation omitted) ("Disputes as to the strength of [an expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."). Finally, MTS II is GRANTED as to certain of the documents submitted by Plaintiff in opposition to Defendants' motion for summary judgment given that Plaintiff never produced such documents during discovery. Indeed, Plaintiff concedes and "asks the Court to strike documents AM General filed in opposition to Activision's motion on the grounds that AM General did not produce them in discovery." (Pl. AMG's Mem. of Law in Opp'n to Defs.' Second Mot. to Strike, ECF No. 206, at 7.)

U.S. military operations." (Defs. Activision and MLG's Mem. of Law in Support of Mot. for Summ. J. ("Defs.' Mem."), ECF No. 139, at 6 (quoting Pl. AMG's Statement of Undisputed Material Facts in Support of Pl. AMG's Mot. for Partial Summ. J., ECF No. 143, ¶ 23).) From Panama to Somalia, and to this day in Iraq and Afghanistan, the Humvee has become an iconic and a ubiquitous symbol of the modern American military. (Defs.' Mem. at 6; Pl. AMG's Mem. of Law in Opp'n to Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 171, at 3.) AMG continues to produce Humvees for the U.S. armed forces and the militaries of over 50 countries. (Compl. ¶¶ 15–16.)

Since the early 1990s, AMG has also granted licenses to other companies to use the Humvee trademark "on or in connection with a wide variety of products," including toys and at least four video games. (Compl. ¶¶ 25–31.) Humvees have also appeared in a wide variety of other media, including Hollywood blockbusters, such as *Jurassic Park* and *The Avengers,* television series, such as *24*, *The Simpsons*, *The Walking Dead*, and *Long Road Home*, and Academy Award-winning dramas, such as *The Hurt Locker*. (Defs.' Mem. at 7.) Additionally, a number of video games, manufactured by video game developers other than Defendants, have featured Humvees. (*Id.* at 8.)

*Call of Duty* is one of the "most popular and well-known video game franchises in the world" with over 130 million units sold. (Rule 56.1 Statement of Undisputed Facts in Supp. of Mot. of Defs. Activision and AMG for Summ. J. ("Defs.' 56.1"), ECF No. 158, ¶ 2.) Indeed, the *Call of Duty* franchise—which is a first-person shooter series developed, produced, and distributed by Activision—is characterized by its realism, cinematic set-pieces, and fast-paced multiplayer mode. (*Id.* ¶¶ 7–10; Compl. ¶¶ 3–4; Defs.' Mem. at 4–5.) While various consumers play *Call of Duty* from the comfort of their own homes, both through single-player campaigns and in online

multiplayer mode, others compete in tournaments hosted by organizations, such as MLG. (*Id.* at 3; Defs.' 56.1 ¶ 89.)

## B. Alleged Infringing Conduct: Humvees and *Call of Duty*.

Humvees are depicted in nine *Call of Duty* games for varying durations. (Pl.'s Mem. at 4; Defs.' Mem. at 9–10.) In particular, whereas sometimes they appear briefly in the background or are mentioned in passing through dialogue, at other times, players ride in a Humvee for several minutes during a scene or level. (Pl.'s Counter 56.1 ¶¶ 56–62.) Further, at times, the player can even "assum[e] control of the [Humvee]," including by firing a turret-mounted machine gun. (Pl.'s Counter 56.1 ¶ 3.) In certain instances, the player cannot progress to the next level without interacting with the Humvee. (Pl.' Counter 56.1 ¶ 56.) Humvees are also shown in several trailers for the games and in *Call of Duty*-branded strategy guides. (Defs.' Mem. at 10–11.) Defendants also licensed a toy company to manufacture *Call of Duty*-branded construction sets, two of which include toy vehicles. (Compl. ¶ 8.) According to AMG, they bear the distinctive elements of the Humvee's trade dress. (*Id.* ¶¶ 54–55.) Plaintiff asserts that Defendants did not receive authorization from AMG for such uses. (*Id.* ¶ 102.)

As to an instruction manual included inside each disk case for *Call of Duty 4: Modern Warfare*, Activision included the following language:

> All title, ownership rights and intellectual property rights in and to this Program (including but not limited to any patches and updates) and any and all copies thereof (including but not limited to any titles, computer code, themes, objects, characters, character names, stories, dialog, catch phrases, locations, concepts, artwork, animation, sounds, musical compositions, audio-visual effects, methods of operation, moral rights, any related documentation, and "applets" incorporation into this Program) are owned by Activision, affiliates of Activision or Activision's licensors.

(Decl. of Cory D. Struble ("Struble Decl."), Ex. 118 (*Call of Duty 4: Modern Warfare*), ECF No. 141-10, at AMG0075793.) Similar language appears in comparable sections of the instruction

booklets accompanying *Call of Duty: Modern Warfare 2*, *Call of Duty: Modern Warfare 3*, and *Call of Duty: Black Ops II*. (*See* Struble Decl., Ex. 119 (*Call of Duty: Modern Warfare 2*), ECF No. 141-11, at AMG0075815; Struble Decl., Ex. 120 (*Call of Duty Modern Warfare 3*), ECF No. 141-12, at AMG0075835; Struble Decl., Ex. 117 (*Call of Duty: Black Ops II*), ECF No. 141-9, at AMG0075777.)

### C.  Plaintiff's Letters.

In 1998, the Beanstalk Group—a third-party that served at the time as a licensing agent for AMG—sent a letter[2] to Activision regarding the video game *Sin*, which is unaffiliated with the *Call of Duty* franchise (the "1998 letter"). (Pl.'s Counter 56.1 ¶¶ 53–54.) According to AMG, in the 1998 letter, the Beanstalk Group "complained to Activision about its use of the [Humvee] Trade Dress in a video game called *Sin*." (*Id.* ¶ 54.) AMG cites the 1998 letter for the proposition that Activision "agreed to remove [Humvee] vehicles from the video game *Sin*." (*Id.* ¶ 55.)

On or about June 20, 2016, counsel for Global Icons, LLC—an outside licensing agency contracted by AMG—sent a cease-and-desist letter to Defendants objecting to the appearances of Humvees in *Call of Duty* games and toys. (Compl. ¶¶ 78–79.) Shortly thereafter, on November 4, 2016, Defendants released *Call of Duty: Modern Warfare Remastered*, which included scenes with Humvees. (Pl.'s Counter 56.1 ¶ 5.) Subsequently, AMG initiated this action on November 7, 2017. (*See* Compl.)

## II.   LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "An issue of

---

[2] The 1998 letter, which includes a purported conversation between a representative from Beanstalk Group and a representative from Activision, is under seal with this Court. (*See* Struble Decl., Ex. 121 (1998 Letter), ECF No. 141-13.)

fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted).

"The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In turn, to defeat a motion for summary judgment, the opposing party must raise a genuine issue of material fact. *See Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (explaining that the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial"). To do so, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts," *id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)) (internal quotation marks omitted). Rather, the opposing party must produce admissible evidence that supports its pleadings. *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968). In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the opposing party and draw all reasonable inferences in that party's favor. *See id.* However, "a court must not weigh the evidence, or assess the credibility

of witnesses, or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (citation and internal quotation marks omitted). Summary judgment is therefore "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286.

## III.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IS GRANTED

### A. Federal and New York Trademark Infringement Claims.

Where the defendant's product is artistic or expressive, courts have interpreted the Lanham Act narrowly in order to avoid suppressing protected speech under the First Amendment. *See Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) (explaining). The court in *Rogers* articulated a two-prong test that allows artistic or expressive works to make use of trademarks under most circumstances without facing liability under the Lanham Act. The court found that the "balance [between trademark interests and First Amendment speech interests] will normally not support application of the [Lanham] Act unless [the use of the trademark] has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless [the use of the trademark] explicitly misleads as to the source or the content of the work." *Rogers*, 875 F.2d at 999. Although *Rogers* dealt only with a potentially confusing title, the Second Circuit has since held that "the *Rogers* balancing approach is generally applicable to Lanham Act claims against works of artistic expression." *Cliff Notes v. Bantam Doubleday Dell Publ'g Grp.*, 886 F.2d 490, 495 (2d Cir. 1989).

Under the first prong of the *Rogers* test, courts must determine whether the use of the trademark has any "artistic relevance to the underlying work whatsoever." *Rogers*, 875 F.2d at 999. This requirement, though real, is not unduly rigorous out of the understanding that the "overextension of Lanham Act restrictions . . . might intrude on First Amendment values." *Id.* at 998. *See Louis Vuitton Malletier S.A. v. Warner Bros. Entm't*, 868 F. Supp. 2d 172, 178 (S.D.N.Y. 2012) (describing the artistic relevance threshold as "purposely low"). In *Rogers*, for example, the

contested film's title—"Ginger and Fred"—possessed artistic relevance because "the central characters in the film [we]re named 'Ginger' and 'Fred,' and these names . . . ha[d] genuine relevance to the film's story." *Rogers*, 875 F.2d at 1001.  Accordingly, no more rigorous examination of artistic merit was required or even appropriate.

If the contested use has artistic relevance, then the court must proceed to the second prong of the *Rogers* test and determine whether the use "explicitly misleads as to the source or the content of the work." *Rogers*, 875 F.2d at 999.  It is not enough that a likelihood of confusion exists; rather, "the finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest recognized in *Rogers*." *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993).  Such evaluation of misleadingness "must be made, in the first instance, by application of the venerable *Polaroid* factors." *Id.  See also DeClemente v. Columbia Pictures Indus., Inc.*, 860 F. Supp. 30, 51 (E.D.N.Y. 1994) ("The analysis to determine consumer confusion and misleading under the balancing test of *Rogers* is conducted by applying the eight[-]factor test for consumer confusion set forth in *Polaroid* [*v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)].").  Notably, "the finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest recognized in *Rogers*." *Twin Peaks*, 996 F.2d at 1379; *see Cliff Notes v. Bantam Doubleday Dell Publ'g Grp.*, 886 F.2d 490, 494 (2d Cir. 1989) (courts must "strike the balance between the two competing considerations of allowing artistic expression and preventing consumer confusion").

A comparison of two cases—namely, *Louis Vuitton* and *Simon & Schuster*—illustrates how courts employ the *Rogers* framework to weigh trademark concerns against First Amendment interests.  In *Louis Vuitton*, a character in the defendant's film, *The Hangover: Part II*, humorously mispronounced his knockoff Louis Vuitton bag as a "Lewis Vuitton." *Louis Vuitton*, 868 F. Supp.

2d at 174–75.   The plaintiff filed an action, claiming that the defendant had "affirmatively misrepresent[ed]" that the knockoff was one of the plaintiff's products.   *Id.* at 175.   Such a use, the plaintiff asserted, likely confused the public into believing that the plaintiff had "sponsored and approved" the use of the knockoff.   *Id.*   As the court explained, the film's use of the bag had artistic relevance: its flaunting and subsequent mispronunciation revealed that the character was "snobbish" and "socially inept," and "introduce[d] the comedic tension between [two characters] that appear[ed] throughout the [f]ilm."   *Id.* at 178.   And even if there *were* some confusion as to whether this scene "impl[ied] that [the plaintiff] approved the use of the [knockoff] bag in the [f]ilm," the court held that "the public's interest in avoiding consumer confusion . . . [wa]s not so great as to overcome the significant threats to free expression from holding [the defendant] liable for its noncommercial speech in this case."   *Id.* at 183.   Thus, the court rejected the plaintiff's trademark claim.   *Id.*

In contrast, the court in *Simon & Schuster* held that the presence of many of the *Polaroid* factors outweighed a meager invocation of the First Amendment.   *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 301 (S.D.N.Y. 1997).   The plaintiff, publisher of "The Book of Virtues" both in print and as an audiobook, sued the defendant for publishing "The Children's Audiobook of Virtues," an audiobook, and planning to publish "The Children's Book of Virtues," a print book.   *Id.* at 282.   The court found that at least five of the eight *Polaroid* factors favored the plaintiff.   *Id.* at 297–300.   Subsequently, the court held that the defendant had "reflexively invoked the First Amendment without offering a persuasive explanation of why free speech interests are seriously threatened by Lanham Act liability in this case."   *Id.* at 300.   The court explained that "[u]nlike the film title in *Rogers*, [the defendant's] title [wa]s not an 'integral element' of its books and their creator's 'artistic expressions.'   Rather, the evidence show[ed] that

[the defendant] deliberately gave its children's story books confusingly similar titles in a blatant and ill-conceived effort to piggy-back on the goodwill associated with [the plaintiff's] best-selling title." *Id.* at 300–01 (quoting *Rogers*, 875 F.2d at 1001).

It can be inferred from *Louis Vuitton* and *Simon & Schuster* that an artistically relevant use will outweigh a moderate risk of confusion where the contested user offers a "persuasive explanation" that the use was an "integral element" of an artistic expression rather than a willful attempt to garnish the trademark owner's goodwill for profit. *Id.* An "integral element" does *not* have to be a "but-for" aspect of the work. It was *metaphysically* possible for Defendants to have produced video games without the presence of Humvees, just as it was *technically* possible for the film in *Rogers* to have had a different title or for the film in *Louis Vuitton* to have deleted the scene with the knockoff bag. *Cf. Matsushita Elec. Indus. Co, LTD v. Zenith Radio Corp.*, 475 U.S. 574, 586, 475 U.S. at 586 (noting that the opposing party needs more than "some metaphysical doubt as to the material facts" to avoid summary judgment). Instead, an integral element is one that "communicate[s] ideas—and even social messages," either "through many familiar literary devices (such as characters, dialogue, plot, and music)" or "through features distinctive to the medium (such as the player's interaction with the virtual world)." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011); *see also Yankee Publ'g Inc. v. News America Publ'g Inc.* 809 F. Supp. 267, 275 (S.D.N.Y. 1992) ("the First Amendment confers a measure of protection for the unauthorized use of trademarks when that use is a part of the expression of a communicative message"); *Rogers*, 875 F.2d at 1001 (explaining that where the title effectively satirized the "gaudiness and banality of contemporary television," it was "an integral element of the film and the film-maker's artistic expressions").

The elements of a successful New York common law claim of trademark infringement parallel the elements required for a Lanham Act trademark infringement claim. *See Van Praagh v. Gratton*, 993 F. Supp. 3d 293, 302 (E.D.N.Y. 2014) (citing *Allied Interstate LLC v. Kimmel & Silverman P.C.*, No. 12 Civ. 4204 (LTS) (SN), 2013 WL 4245987, at *5 (S.D.N.Y. Aug. 12, 2013)); *Allied Maint. Corp. v. Allied Mech. Trades, Inc.*, 369 N.E.2d 1162, 1165 (N.Y. 1977). As such, both state and federal trademark infringement claims will be assessed together.

### 1. Artistic Relevance

Starting at the first prong of the *Rogers* test, Defendants' uses of Humvees in *Call of Duty* games have artistic relevance. Featuring actual vehicles used by military operations around the world in video games about simulated modern warfare surely evokes a sense of realism and lifelikeness to the player who "assumes control of a military soldier and fights against a computer-controlled or human-controlled opponent across a variety of computer-generated battlefields." *Novalogic, Inc. v. Activision Blizzard*, 41 F. Supp. 3d 885, 890 (C.D. Cal. 2013). The reasoning articulated by the court in *Novalogic* is highly persuasive in this regard. Specifically, the court applied the *Rogers* framework to a motion for summary judgment in a dispute over contested uses in a *Call of Duty* game. *See id.* at 898–99. Upon reviewing a copy of the *Call of Duty* game, the court explained that the uses of the plaintiff's name and logo "easily met the artistic relevance requirement under *Rogers*" because they gave players "a sense of a particularized reality of being part of an actual elite special forces operation and serve[d] as a means to increase specific realism of the game." *Id.* at 900; *see also Mil–Spec Monkey, Inc. v. Activision Blizzard, Inc.*, 74 F. Supp. 3d 1134, 1136 (N.D. Cal. 2014) (similar). The same is true here with respect to Humvees. Accordingly, any reasonable juror would conclude that the presence of Humvees in *Call of Duty*

games possesses an artistic value that is at least "above zero." *Communico, Ltd. v. DecisionWise, Inc.*, No. 14 Civ. 1887 (RNC), 2018 WL 1525711, at *8 (D. Conn. Mar. 28, 2018)

### 2. *Polaroid Factors*

Proceeding to the second prong of the *Rogers* test, Defendants' uses of Humvees in the *Call of Duty* games are not explicitly misleading. As the court in *Rogers* recognized, a survey documenting confusion is not dispositive. *See Rogers*, 875 F.2d at 1001 ("The survey evidence, even if its validity is assumed, . . . is so outweighed by the interests in artistic expression as to preclude application of the Lanham Act."). Indeed, "no amount of evidence showing *only* consumer confusion can satisfy the 'explicitly misleading' prong of the *Rogers* test because such evidence goes only to the 'impact of the use' on a consumer." *Twentieth Century Fox Television v. Empire Distribution Inc.*, 161 F. Supp. 3d 902, 909 (C.D. Cal. 2016) (emphasis added) (quoting *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1245–46 (9th Cir. 2013)). Instead, "the venerable *Polaroid* factors" must be applied. *Twin Peaks*, 996 F.2d at 1379. "No one of the *Polaroid* factors is dispositive, and the list is not exhaustive; 'the analysis of the factors is not a mechanical process.'" *Estee Lauder Inc. v. The Gap*, 108 F.3d 1503, 1510 (2d Cir. 1997) (quoting *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir. 1995)).

### a. Strength of Plaintiff's Mark

The first *Polaroid* factor is "the strength of [the plaintiff's] mark." *Polaroid*, 287 F.2d at 495. Courts considering this factor "focu[s] on the 'distinctiveness of the mark, or more precisely, its tendency to identify the goods' as coming from a particular source." *Museum of Modern Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 373 (S.D.N.Y. 2018) (quoting *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 581 (2d Cir. 1991)). Additionally, courts consider both "the mark's inherent distinctiveness, based on the characteristics of the mark itself, and its acquired

distinctiveness, based on associations the mark has gained through use in commerce." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 333 (S.D.N.Y. 2013) (citing *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743–44 (2d Cir. 1998)). Here, Defendants do not challenge the strength of Plaintiff's mark—instead, they contest its relevancy. (*See* Reply Mem. of Defs. Activision and MLG's in Further Supp. of Mot. for Summ. J. ("Defs.' Reply Mem."), ECF No. 195, at 9.) Accordingly, the first *Polaroid* factor weighs in Plaintiff's favor.

   b.   Degree of Similarity

   The second *Polaroid* factor is "the degree of similarity between the two marks." *Polaroid*, 287 F.2d at 495. "[T]he test . . . is whether confusion is probable among numerous customers who are ordinarily prudent." *Estee Lauder*, 108 F.3d at 1511. "[If] the marks are used for different purposes and are presented to the public differently, even though they say the same thing, they are dissimilar and no issue of fact is created." *DeClemente*, 860 F. Supp. at 47. Here, Plaintiff and Defendants use Humvees "for different purposes." *Id.* Plaintiff contends that Defendants replicated the Humvee design in its games with the "admitted intention that consumers would recognize it" as a Humvee, but recognition is not confusion. (Pl.'s Mem. at 19.) While both parties have the general "purpose" of selling products for profit, Plaintiff's purported concept of shared purpose is far too abstract to argue reasonable confusion. Put simply, Plaintiff's purpose in using its mark is to sell vehicles to militaries, while Defendants' purpose is to create realistically simulating modern warfare video games for purchase by consumers. (*Compare* Compl. ¶ 14 ("AM General designs, engineers, manufactures, supplies, and supports specialized vehicles for military and commercial customers."), *with id.* ¶ 4 ("Defendant Activision Blizzard, Inc. is an interactive entertainment company and video game developer. Defendant Activision Blizzard, Inc. earns

revenue through the sale, distribution, and licensing of content related to its video games."). Thus, the second *Polaroid* factor weighs in Defendants' favor.

      c.  Proximity

The third *Polaroid* factor is "the proximity of the products." *Polaroid*, 287 F.2d at 495. This factor "focuses on whether the two products compete with each other," with special attention devoted to assessing whether goods "serve the same purpose, fall within the same general class, or are used together." *Lang*, 949 F.2d at 582. Proximity may be measured both in terms of "market proximity" and "geographic proximity." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 134 (2d Cir. 2004). Here, the products are far from proximate. Specifically, Plaintiff's vehicles and Defendants' video games do not "serve the same purpose" nor "fall within the same general class," and certainly are not "used together." *Lang*, 949 F.2d at 582.

In an attempt to salvage this factor in its favor, Plaintiff asserts that "[i]t is also in the business of licensing-out the rights to depict [Humvees] in video games and toys." (Pl.'s Mem. at 21). However, the competitive proximity inquiry focuses on a user's "central purpose" and "focus" rather than a "sporadic and marginal aspect of [the user's] purposes." *Girl Scouts of U.S. of Am. v. Bantam Doubleday Dell Publ'g Grp.*, 808 F. Supp. 1112, 1126–27 (S.D.N.Y. 1992). Where Plaintiff's business is solely focused on automobiles, a reasonable jury would view its forays into video game licensing as merely a "sporadic and marginal aspect" of its business rather than its "central purpose" and "focus." *Id.* (*See* Compl. ¶ 14 ("AM General designs, engineers, manufactures, supplies, and supports specialized vehicles for military and commercial customers. It is best known today for its global leadership in the design and production of, and support for, the [Humvee].").) The third *Polaroid* factor therefore points in Defendants' favor.

d.  Bridging the Gap

The fourth *Polaroid* factor is "the likelihood that the prior owner will bridge the gap." *Polaroid*, 287 F.2d at 495. "'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 387 (2d Cir. 2005) (citing *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 963 (2d Cir. 1996)). When "First Amendment considerations figure strongly in [a] case, however, the weight of this factor must be minimal." *Girl Scouts*, 808 F. Supp. at 1127. Plaintiff has presented no evidence that it is likely to enter the video game industry let alone evidence that consumers would expect it to do so. As such, the fourth *Polaroid* factor tips in Defendants' favor.

e.  Evidence of Actual Confusion

The fifth *Polaroid* factor is "actual confusion." *Polaroid*, 287 F.2d at 495. Courts "consider the evidence that consumers are actually confused as to the origin of a particular product or service or as to whether the junior user of a mark is sponsored by or affiliated with the senior user." *Disney Enters. v. Sarelli*, 322 F. Supp. 3d 413, 435 (S.D.N.Y. 2018). Importantly, "[e]ven assuming that factor (5), actual confusion, favors [Plaintiff], *Rogers* teaches that mark owner's must accept 'some' confusion when outweighed by free speech interests." *Louis Vuitton*, 868 F. Supp. 2d at 184 n.19 (quoting *Rogers*, 875 F.2d at 1001)). Here, there is no evidence of actual confusion. As evidence of actual confusion Plaintiff proffers a survey[3] which, it argues, "found that 16% of consumers shown actual video game play from Activision's games were confused as to AM General's association with *Call of Duty*." (Pl.'s Mem. at 23 (emphasis deleted).)

---

[3] As discussed previously, Defendants' motion to strike Dr.'s Wind's survey is denied because any defects that Defendants claim exist in Dr. Wind's expert report go to the weight of the evidence, not to its admissibility. *See McCullock*, 61 F.3d at 1044.

Less than 20 percent confusion regarding two companies' "association" (Pl.'s Mem. at 23) is at most *some* confusion. Further, "*Rogers* teaches that mark owner's must accept 'some' confusion when outweighed by free speech interests." *Louis Vuitton*, 868 F. Supp. 2d at 184 n.19 (quoting *Rogers*, 875 F.2d at 1001)). Even the most favorable reading of the sole survey upon which Plaintiff relies does not hurdle this requirement. *See Twin Peaks*, 996 F.2d at 1379 ("[T]he finding of likelihood of confusion must be *particularly compelling* to outweigh the First Amendment interest recognized in *Rogers*.") (emphasis added). Accordingly, while the fifth *Polaroid* factor only slightly weighs in Plaintiff's favor, the countervailing First Amendment considerations counsel against according it undue importance in this context.

    f.   Good Faith

The sixth *Polaroid* factor is the "defendant's good faith in adopting its own mark." *Polaroid*, 287 F.2d at 495. "This factor considers whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion" between the two products. *Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, 335 F. Supp. 3d 566, 591 (S.D.N.Y. 2018) (alterations in original) (quoting *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 460 (2d Cir. 2004)). While "[b]ad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark," the gravamen of bad faith is "the intent to sow confusion between the two companies' products." *Star Indus.*, 412 F.3d at 388–89; *see also Radio Channel Networks, Inc. v. Broadcast.Com, Inc.*, No. 98 Civ. 4799 (RPP), 1999 WL 124455, at \*5 (S.D.N.Y. Mar. 8, 1999), *aff'd*, 201 F.3d 432 (2d Cir. 1999) ("[E]ven assuming that plaintiff is able to prove that defendant knew of plaintiff's mark, it must allege something more than mere knowledge of the claimed mark on the part of the defendant."). "Although deliberate copying may indicate that the defendant acted in bad faith, the District Court is not required to draw that

inference where there is evidence to the contrary." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 118 (2d Cir. 2009) (citation ommited). Finally, "[t]he fact that, prior to the commencement of the lawsuit, defendant did not abandon its project at plaintiff's suggestion, does not itself evidence a lack of good faith." *Andy Warhol Enters., Inc. v. Time Inc.*, 700 F. Supp. 760, 766 (S.D.N.Y. 1988).

In order to demonstrate bad faith, Plaintiff relies largely on the 1998 letter. (Pl.'s Mem. at 24 (citing Pl. AMG's Mem. of Law in Supp. of Mot. for Partial Summ. J. ("Pl.'s Partial Summ. J. Mem."), ECF No. 142, at 15–16).) However, where the 1998 letter would be inadmissible at trial, this Court need not consider it at summary judgment.[4] *See First Nat'l Bank of Ariz.*, 391 U.S. at 289–90; *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014); *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010).

Apart from the 1998 letter, Plaintiff points to (1) a handful of statements by Defendants' employees in "documents, emails, and witness testimony," (Pl.'s Mem. at 24 (citing Pl.'s Partial Summ. J. Mem. at 18–20)); (2) the presence of Humvees decorated with *Call of Duty* logos at several in-person promotional events, (*see id.* at 2); and (3) the statements in several user guides included inside the *Call of Duty* games which, Plaintiff argues falsely tell consumers that Activision either owns or licenses the Humvee IP. (*Id.* at 28.) However, these three clutches of

---

[4] First, Defendants did not "manifest[t] that it adopted or believed [the 1998 letter] to be true." Fed. R. Evid. 801(D)(2)(B). Since there is no indication that Defendants responded to Plaintiff's letter, the only basis for adoption would be admission by silence. "In most circumstances silence is so ambiguous that it is of little probative force." *United States v. Hale*, 422 U.S. 171, 176 (1975). A recipient's failure to reply to a letter does not demonstrate acquiescence unless it was reasonable under the circumstances for the sender to expect a response. *See Hellenic Lines Ltd. v. Gulf Oil Corp.*, 340 F.2d 398, 401 (2d Cir. 1965). Particularly, the 1998 letter came from a third-party licensing agent—hardly a likely source of potential liability such that it would have been "natural under the circumstances [for Defendants] to object" to any potential mischaracterizations in the letter. *Hale*, 422 U.S. at 176. Nor was the 1998 letter akin to the 2016 cease-and-desist letter sent by counsel for Global Icons (on behalf of AMG). (*see* Compl. ¶ 79). The latter would have alerted Defendants to seek legal advice in a way that the former would not have.

circumstantial evidence, even if afforded the benefit of all reasonable inferences in Plaintiff's favor, *Niagara Mohawk*, 315 F.3d at 175 (quoting *Anderson*, 477 U.S. at 252), do not demonstrate a desire to "sow confusion *between* the two companies' products," *Star Indus.*, 412 F.3d at 388 (emphasis added). For instance, the user guide statements do not affirmatively tell consumers that Activision either owns or licenses the Humvee IP. All that reasonably may be said is that a paragraph in miniscule type buried in a user guide—a paragraph which does not allude to, let alone mention, Humvees *at all*—does not "tell consumers" much of anything. Indeed, such back-end boilerplate provides no basis for "confusion *between* the two companies' products." *Id.* (emphasis added). Accordingly, the sixth *Polaroid* factor tips in Defendants' favor.

g.   Quality of Defendants' Products

The seventh *Polaroid* factor is "the quality of defendant's product." *Polaroid*, 287 F.2d at 495. "If the quality of a junior user's product or service is low compared to the senior user, 'there is an increased chance of actual injury when there is confusion.'" *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 591 (S.D.N.Y. 2015) (quoting *Savin*, 391 F.3d at 461). At the same time, however, a greater disparity in quality makes confusion less likely. *Id.* Put otherwise, a larger gap in quality between users increases the magnitude but decreases the likelihood of harm. Here, neither side has presented evidence that one party's product is superior to the other party's product. As such, this factor favors Defendants. *See Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 193 F. Supp. 3d 245, 274 (S.D.N.Y. 2016).

h.   Consumer Sophistication

The eighth *Polaroid* factor is "the sophistication of the buyers." *Polaroid*, 287 F.2d at 495. One problem for Plaintiff on this point is that the purchasers of Humvees—that is, some 50 militaries from around the world, including the U.S. Armed Forces—are not buying *Call of*

*Duty* games, and vice versa. (Compl. ¶¶ 15–16.) Thus, there is no risk whatsoever that someone will buy the wrong product by accident out of sheer confusion about who built or distributed the product. Indeed, the court in *Louis Vuitton* noted that "moviegoers are sophisticated enough to know that the mere presence of a brand name in a film, especially one that is briefly and intermittently shown, does not indicate that the brand sponsored the movie." *Louis Vuitton*, 868 F. Supp. 2d at 184 n.19. There is no reason to believe that video game players are any less astute. Accordingly, the eighth *Polaroid* factor tips in Defendants' favor.

> i.   Balancing the Polaroid Factors

On balance, the *Polaroid* factors weigh in Defendants' favor. The only *Polaroid* showings made by Plaintiff are the strength of its mark and a less than 20 percent risk of confusion. As such, Plaintiff has failed to demonstrate that the contested uses "explicitly mislea[d] as to the source or the content of the work." *Rogers*, 875 F.2d at 999.

> 3.   *Rogers Balancing Test*

To the extent that any of the *Polaroid* factors are satisfied—such that a modicum of confusion might be present—Plaintiff nonetheless has failed to present sufficient evidence to defeat summary judgment. The *Rogers* balancing inquiry examines whether the contested user has offered a "persuasive explanation" regarding the use's status as an "integral element" of the artistic expression. *Simon & Schuster*, 970 F. Supp. at 300–01 (quoting *Rogers*, 875 F.2d at 1001). Defendants have offered a persuasive explanation: the uses of Humvees in the *Call of Duty* games enhance the games' realism. Both parties agree that at least "some of the vehicles in the *Call of Duty* Games are representative of those that a real-life soldier would expect to see in the time and place depicted." (Pl.'s Counter 56.1 ¶ 19 (some emphasis deleted).) Both parties also agree that U.S. and foreign militaries use Humvees in operations around the world. (*Id.* ¶¶ 23–26.) If realism

is an artistic goal, then the presence in modern warfare games of vehicles employed by actual militaries undoubtedly furthers that goal.   The inclusions of Humvees in the foreground or background of various scenes—including several instances of players using Humvees to advance to the next level—are integral elements of a video game because they "communicate ideas . . . through features distinctive to the medium (*such as the player's interaction with the virtual world*)." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (emphasis added).   Further, assuming *arguendo* that realism is the *only* artistic interest that *Call of Duty* games possess—an assumption potentially belied by the presence of narrative campaign modes in all of the challenged games—it is also true that realism can have artistic merit in itself.   *See United States v. One Book Entitled Ulysses by James Joyce*, 72 F.2d 705, 706 (2d Cir. 1934) (A. Hand, J.) (demonstrating that novel accused of obscenity "as a whole ha[d] a realism characteristic of the present age" and was a "sincere portrayal with skillful artistry," which accordingly, gave the novel an "artistic merit").

Based on the undisputed facts regarding Humvees' widespread use by modern militaries coupled with other evidence that Defendants have submitted and cited on their behalf, *see* Defs.' Reply Mem. at 6 (citing Defs.' 56.1 ¶¶ 14–19), Defendants have satisfied their initial burden of production under Federal Rule of Civil Procedure 56.   The evidence submitted "negates an essential element of [Plaintiff's] claim," *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)), insofar as it negates Plaintiff's claim that the uses of the Humvees are "a blatant and ill-conceived effort to piggy-back on the goodwill associated with" Humvees rather than "an 'integral element' of [the *Call of Duty* games] and their creator's 'artistic expressions.'" *Simon & Schuster*, 970 F. Supp. at 301 (quoting *Rogers*, 875 F.2d at 1001).

In response, Plaintiff offers "conclusory allegations," *Fujitsu*, 247 F.3d at 428, "unsubstantiated speculation," *id.*, and "[t]he mere existence of a scintilla of evidence." *Anderson*, 477 U.S. at 252.  Plaintiff challenges Defendants' claims of realism and artistic relevance *only* "to the extent that the proffered statement of fact is meant to suggest that [Defendants'] use of the [Humvee] was motivated by artistic rather than commercial considerations." (Pl.'s Counter 56.1 ¶¶ 14, 16.)  However, merely insinuating that a commercial motivation might exist is not enough— an artist can sell her art without the First Amendment abandoning her.  *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56 n.5 (1988) ("[T]he degree of First Amendment protection is not diminished merely because the newspaper or speech is sold rather than given away.").  Instead, Plaintiff must present admissible evidence that Defendants' invocation of the First Amendment was pretextual.  *See Simon & Schuster*, 970 F. Supp. at 300 (finding that there is no First Amendment protection afforded when Defendant appears to have "reflexively invoked the First Amendment without offering a persuasive explanation of why free speech interests are seriously threatened by Lanham Act liability in this case").  Apart from innuendo and "unsubstantiated speculation," *Fujitsu*, 247 F.3d at 428, Plaintiff has failed to present evidence that Defendants' sole interests were commercial.

Unable to offer anything more than "some metaphysical doubt as to the material facts" offered by Defendants, *Matsushita*, 475 U.S. at 586, Plaintiff is unable to "overcome the presumption of *Rogers*." *Twin Peaks*, 996 F.2d at 1379.  Accordingly, Defendants' motion for summary judgment is granted dismissing trademark infringement claims under the Lanham Act.  As a result, Plaintiff's pendant state law trademark infringement claim fails as well.  *See Van Praagh*, 993 F. Supp. 3d at 302.

**B.  Federal and New York Trade Dress Claims.**

"To plead a claim of trade dress infringement involving the appearance of a product, [a plaintiff] must allege that (1) the claimed trade dress is non-functional; (2) the claimed trade dress has secondary meaning; and (3) there is a likelihood of confusion between the plaintiff's good and the defendant's." *Sara Designs, Inc. v. A Classic Time Watch Co. Inc.*, 234 F. Supp. 3d 548, 555 (S.D.N.Y. 2017) (alteration in original) (quoting *Sherwood 48 Assocs. v. Sony Corp. of Am.*, 76 F. App'x 389, 391 (2d Cir. 2003)).   Courts determine likelihood of confusion by applying the *Polaroid* factors.  *See, e.g.*, *Best Cellars, Inc. v. Wine Made Simple, Inc.*, 320 F. Supp. 2d 60, 73 (S.D.N.Y. 2003).  ("The likelihood of consumer confusion is determined by considering the eight non-exhaustive factors originally elaborated in *Polaroid . . . .*").

Trade dress infringement claims under New York state common law contain the same elements as trade dress infringement claims pursuant to the Lanham Act.  *See Sports Traveler, Inc. v. Advance Magazine Publishers, Inc.*, 25 F. Supp. 2d 154, 166 (S.D.N.Y. 1998) ("The analysis for trade dress infringement is the same under both the Lanham Act and New York State common law.").  Thus, the two trade dress infringement claims will be considered together.

Assuming *arguendo* that a Humvee's trade dress is non-functional and has secondary meaning, Plaintiff still fails to demonstrate a likelihood of confusion according to the *Polaroid* analysis performed above.  Given the improbability of confusion between a vehicle and a video game—or, in the case of the contested toys, between a plastic figurine and a full-blown military machine—this Court grants Defendants' motion for summary judgment on Plaintiff's federal and New York trade dress claims.

### C. Federal and New York Unfair Competition Claims.

"A Lanham Act unfair competition claim examines 'whether the public is likely to be misled into believing that the defendant is distributing products manufactured or vouched for by the plaintiff.'" *Int'l Diamond Imps., Inc. v. Oriental Gemco (N.Y.), Inc.*, 64 F. Supp. 3d 494, 513 (S.D.N.Y. 2014) (quoting *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir. 1981)). Just as with a trademark infringement claim, a Lanham Act unfair competition claim requires showing "(1) that [the plaintiff] has a valid mark that is entitled to protection under the [Lanham] Act and (2) that [the d]efendant['s] actions are likely to cause confusion as to the origin of the mark." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003); *see also L'Oreal USA, Inc. v. Trend Beauty Corp.*, No. 11 Civ. 4187 (RA), 2013 WL 4400532, at *14 (S.D.N.Y. Aug. 15, 2013). The same *Polaroid* factors relevant to trademark infringement claims also help establish a likelihood of confusion in unfair competition cases, *see Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986), and the *Rogers* balancing test governs in order to address First Amendment concerns, *see Twin Peaks*, 996 F.2d at 1378–80 (applying *Rogers* to a Lanham Act unfair competition claim).

"An unfair competition claim under New York common law requires all the elements of a Lanham Act unfair competition claim plus a showing of bad faith." *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 244 (S.D.N.Y. 2013) (citation omitted).

Although neither party disputes the validity of Plaintiff's mark, Plaintiff fails to show a likelihood of confusion under the *Polaroid* factors. Any degree of confusion that does exist is outweighed by the First Amendment interests reflected in the *Rogers* balancing test. Insofar as a New York unfair competition claim requires, at a minimum, satisfaction of all of the elements of a federal claim, this Court need not reach the question of whether Plaintiff has made a showing of

bad faith. *See C=Holdings*, 922 F. Supp. 2d at 244. Therefore, Defendants' motion for summary judgment is granted with respect to Plaintiff's federal and state unfair competition claims.

## D. Federal and New York False Designation of Origin Claims.

Under the Lanham Act, a plaintiff makes out a false designation of origin claim upon showing that the defendant "attempt[ed] to sell its product with a false designation that suggests the product originated from the plaintiff." *Pulse Creations, Inc. v. Vesture Group, Inc.*, 154 F. Supp. 3d 48, 57 (S.D.N.Y. 2015) (quoting *Sun Trading Distrib. Co., Inc. v. Evidence Music, Inc.*, 980 F. Supp. 3d 722, 727 (S.D.N.Y. 1997)). Such false designation must be "likely to cause consumers [to have] 'confusion as to the origin or sponsorship of defendant's goods.'" *Id.* at 56 (quoting *Victorinox AG v. B & F Sys., Inc.*, 114 F. Supp. 3d 132, 139 (S.D.N.Y. 2015)).

False designation of origin claims under New York state law are evaluated under the "same standards" as those under the Lanham Act. *Disney*, 322 F. Supp. 3d at 430.

The only thing remotely close to a "false designation" is the legalese buried inside several games' user guides. For the reasons discussed above in the *Polaroid* analysis, Plaintiff has not reasonably shown that these statements are "likely to cause consumers [to have] 'confusion as to the origin or sponsorship of defendant's goods.'" *Pulse Creations*, 154 F. Supp. at 56 (quoting *Victorinox*, 114 F. Supp. 3d at 139). Defendants' motion for summary judgment on Plaintiff's federal and New York false designation of origin claims therefore is granted.

## E. Federal False Advertising Claim.

"To prevail on a Lanham Act false advertising claim, a plaintiff must establish that the challenged message is (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to the plaintiff." *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016) (citation ommitted).

"[U]nder a 'literal falsity' theory, a plaintiff must show that the challenged advertisement is 'false on its face' or 'explicitly false.'" *Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 417 (S.D.N.Y. 2013) (quoting *Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*, 348 F. Supp. 2d 165, 178 (S.D.N.Y. 2004)). "That is, the message must be unambiguous." *Id.* (citing *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)).

None of the advertisements complained of by Plaintiffs, (*see* Compl. ¶¶ 47–53), contain a literally or impliedly false statement, nor has Plaintiff provided any evidence that it has suffered a corresponding "actual or likely injury." *Church & Dwight Co.*, 843 F.3d at 65 (citing *Gnosis*, 760 F.3d at 255–56). As such, Defendants' motion for summary judgment on Plaintiff's federal false advertising claim is granted.

### F. New York False Advertising Claim.

A plaintiff mounting a false advertising claim under New York law "must show: (1) that the defendant's conduct is consumer-oriented; (2) that the defendant is engaged in a deceptive act or practice; and (3) that the plaintiff was injured by this practice." *Blockchain Lux. S.A. v. Paymium, SAS*, No. 18 Civ. 8612 (GBD), 2019 WL 4199902, at *11 (S.D.N.Y. Aug. 7, 2019) (quoting *Heskiaoff v. Sling Media, Inc.*, 119 F. App'x 28, 31 (2d Cir. 2017)).

Plaintiff has not provided any admissible evidence that (1) Defendants' actions or practices were deceptive or (2) Plaintiff suffered any actual injury as a result of a Defendants' actions. Accordingly, Defendants' motion for summary judgment on Plaintiff's New York false advertising claim is granted.

### G. Federal and New York Trademark Dilution Claims.

Federal trademark dilution claims require showing that "(1) the mark is famous; (2) defendant's use of the mark is made in commerce; (3) the defendant used the mark after the mark

is famous; and (4) the defendant's use of the mark is likely to dilute the quality of the mark by blurring or tarnishment." *DigitALB, Sh.a v. Setplex, LLC*, 284 F. Supp. 3d 547, 557 (S.D.N.Y. 2018) (citation omitted).   Importantly, the "risk [of] some dilution of the identifying or selling power of the mark . . . is generally tolerated in the interest of maintaining broad opportunities for expression." *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 44 (2d Cir. 1994) (citing *Rogers*, 875 F.2d at 1000); *see also United We Stand Am., Inc. v. United We Stand Am. N.Y., Inc.*, 128 F.3d 86, 91 (2d Cir. 1997) ("[E]ven if plaintiff suffered some trademark dilution, defendants' right under the First Amendment to use plaintiff's mark to communicate the message might prevail over plaintiff's rights under the trademark law to avoid all dilution.") (citing *Rogers*, 875 F.2d at 999 and *Yankee Publ'g*, 809 F. Supp. at 275–76).

The legal standard for New York trademark dilution claims is "essentially the same" as that applied to federal trademark dilution claims. *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 220 F. Supp. 2d 289, 297 (S.D.N.Y. 2002).   As discussed with respect to the *Polaroid* factor of the quality of Defendants' product, *see* Part III(A)(2)(g), *supra*, Plaintiff has failed to show that the presence of Humvees in the *Call of Duty* games will tarnish or blur Plaintiff and Defendants' trademarks.   To the extent that any dilution *might* occur, it must be "tolerated in the interest of maintaining broad opportunities for expression." *Deere & Co.*, 41 F.3d at 44 (citing *Rogers*, 875 F.2d at 1000).   In view of the above application of the *Rogers* framework, Defendants' motion for summary judgment on Plaintiff's federal and New York trademark dilution claims is granted.

## IV.   PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT IS DENIED

"Laches is an equitable defense available to a defendant who can show 'that the plaintiff has inexcusably slept on [its] rights so as to make a decree against the defendant unfair,' and that

the defendant 'has been prejudiced by the plaintiff's unreasonable delay in bringing the action.'" *Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 190 (2d Cir. 2019) (modification in original) (quoting *Merrill Lynch Inv. Managers v. Optibase Ltd.*, 337 F.3d 125, 132 (2d Cir. 2003)). The laches determination is a "factual question that requires the court to weigh the equities of each case." *Leopard Marine & Trading, Ltd. v. Easy St., Ltd.*, 896 F.3d 174, 194–95 (2d Cir. 2018) (citation omitted). If a plaintiff has no remaining claims against a defendant, the court need not reach the issue of whether laches applies. *See Valentine v. Metro. Life Co.*, No. 85 Civ. 3006 (CSH), 2005 WL 1278524, at *3 n.2 (S.D.N.Y. May 31, 2005).

Because Plaintiff has no remaining claims against Defendants, this Court need not reach the issue of whether laches applies. *See id.* at *3 n.2. Accordingly, Plaintiff's motion for partial summary judgment is denied.

## V.   CONCLUSION

Defendants' motion for summary judgment, (ECF No. 131), is GRANTED. Plaintiff's motion for partial summary judgment, (ECF No. 138), is DENIED. Defendants' motions to strike, (ECF Nos. 162 and 193), are DENIED, except GRANTED in part to strike those documents which were not produced during discovery.

The Clerk of Court is directed to close the motions accordingly.

Dated: New York, New York
March 31, 2020

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge



**Figure 2**



**Figure 3**

6



Figure 6



Figure 7

14